Filed 7/8/15  P. v. Villareal CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038081 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS090625) |
| v. | |
| JOSE VILLAREAL et al., | |
| Defendants and Appellants. | |

A jury convicted defendant Jose Villareal of possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1))[1] and active participation in a criminal street gang (former § 186.22, subd. (a)).[2]  An allegation that he possessed the firearm for the benefit of a criminal street gang (§ 186.22, subd. (b)) was also found true.  Villareal was acquitted of assault with a firearm on a peace officer (§ 245, subd. (d)).  He was sentenced to five years in prison.

The jury convicted defendant Carlos Fletes of possession of a firearm by a felon (former § 12021, subd. (a)(1)), possession of ammunition by a felon (former § 12316, subd. (b)(1)), and active participation in a criminal street gang (§ 186.22, subd. (a)).

---

[1]  Further statutory references are to the Penal Code unless otherwise noted.

[2]  Subsequent references to section 186.22 are to the version in effect when defendants committed their crimes.

Allegations that he possessed the firearm and the ammunition for the benefit of a criminal street gang (§ 186.22, subd. (b)) were also found true.  Fletes was acquitted of assault with a firearm on a peace officer (§ 245, subd. (d)).  He admitted a prior serious felony strike conviction (§§ 667, subd. (a)(1), 1170.12, subd. (c)(1)) and was sentenced to 15 years in prison.

Defendants make substantially the same contentions on appeal, and each expressly joins in the other's arguments to the extent those arguments are favorable to him and relevant to his appeal.  They contend that (1) their substantive gang crime convictions and the gang enhancement findings were not supported by substantial evidence; (2) the trial court abused its discretion and denied them due process by admitting "irrelevant, cumulative and unduly prejudicial" gang evidence; (3) the admission of certain hearsay basis evidence violated their Sixth Amendment right to confront witnesses; (4) the trial court prejudicially misinstructed the jury with former CALCRIM No. 1400; (5) the prosecutor's "pervasive" misconduct denied them due process; and (6) the trial court's errors were cumulatively prejudicial.  Defendants also ask that we independently review the sealed transcripts of the in camera hearing on their supplemental *Pitchess*[3] motions for disclosure of police officer personnel records, which the trial court denied.  We affirm.

## I.  Background

Gang violence between Norteños and Sureños spiked in Salinas during the first two weeks of January 2009.  There were "nearly a dozen shootings" and "five or six" were fatal.  At a January 15 briefing, Monterey County Joint Gang Task Force members received information that a green minivan used in one of the homicides and a white Nissan Altima taken in another might be at one of several body shops "getting painted or

---

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

getting some kind of work done on it to alter its appearance." JR's Body Shop on Dayton Street was one of the shops mentioned. Fletes owned and operated the business in an industrial area of Salinas. His shop was the first in a row of warehouses that faced another row of warehouses across a shared parking lot that opened onto Dayton Street.

Monterey County Deputy Sheriffs Jesse Pinon and Bryan Hoskins and probation officers Leo Salas and Chris Plummer were assigned to the gang task force in January 2009. At around 7:00 p.m. on January 15, Pinon and Salas drove to Fletes's body shop in an unmarked car to conduct surveillance. The other businesses in the area were closed but the shop lights were on. A large roll-up bay door onto the parking lot was open. The inside of the shop was "extremely well-lit" and light spilled into the area in front of the bay door.

Pinon turned into the parking lot and drove by the shop. Two Hispanic males stood near the threshold of the open bay door. Pinon and Salas "immediately" recognized one of them as Villareal, a Sureño gang member and convicted felon. They did not recognize the second man, whom they later identified as Fletes.

Pinon drove past the other warehouses and made a U-turn at the end of the parking lot. Five to 10 minutes later, he and Salas drove by the shop again "to see if we could see the green minivan . . . ." Fletes was still standing in the threshold of the open bay door. His hand was at his waistband. Villareal was standing "next to a stack of tires" to the right of the bay door. As Pinon drove by, Salas saw Villareal pull "a smaller dark-colored object" from the stack of tires and put it "in the small of his back." Salas "believed [Villareal] was attempting to conceal a firearm." Pinon saw Villareal "reach into the tires and retrieve a firearm." Pinon "could see the silhouette of the firearm" in his rearview mirror because "[i]t was well-lit behind [Villareal]." Villareal "placed it behind his back and started squatting down."

Pinon drove out of the parking lot, pulled over down the street, and called Hoskins for assistance. Hoskins was the senior member of the gang task force unit. He and

3

Plummer arrived about 10 minutes later in a marked gang task force vehicle. They followed Pinon and Salas back to the body shop.

Defendants were still outside when the officers' cars turned into the driveway. Villareal assumed "a somewhat aggressive stance" and "appeared to be reaching into his waistband." He and Fletes both focused on Pinon's unmarked vehicle. When they saw the marked patrol unit right behind it, both "took off running into . . . the garage." Each was holding his waistband, a "huge indicator" that they were carrying firearms.

Pinon jumped out of his car and gave chase, yelling that Villareal had a gun. Hoskins and Plummer ran around to the back of the warehouse to prevent anyone from escaping through the rear door. Pinon was "yelling" at Villareal as he pursued him into the shop. "'Police, stop.' 'Villareal, police.' 'Travieso, I know it's you.'" Travieso (which means troublemaker in Spanish) is Villareal's gang moniker.

Villareal kept running. "[H]is hands were in his waistband area, and that was a threat." Villareal was "saying something to the rear of the warehouse" as he ran, but Pinon did not hear what he said. Pinon lost sight of Villareal. Pinon was behind a car "almost in the middle of the warehouse" when he saw Fletes emerge "probably about 10 feet in front of the vehicle." "I see the subject turning towards me with a firearm in his hand." "I see the barrel. As he's looking at me, he is starting to turn his body toward me." Pinon saw "[a] dark-colored firearm, and the barrel of the firearm pointed at me." He saw that Fletes had "both of his hands on the firearm." Pinon yelled, "'Gun'" and fired a single shot. The bullet struck Fletes in the hand, his hands "separated," and he dropped the gun. Pinon did not see where it "flew to" because he kept his eyes focused on Fletes's hands. Fletes dropped to one knee and Pinon yelled at him to keep his hands up.

Hoskins and Plummer were behind the warehouse when they heard the shot. Hoskins left Plummer there and sprinted around to the front, radioing for help as he ran. He saw Salas at the threshold of the bay door and Pinon inside, "challenging defendant

4

Fletes, who was on the ground." Hoskins approached Pinon and asked him what happened. Pinon said that Villareal was somewhere "off to the left." He told Hoskins he shot Fletes in the hand because Fletes pointed a gun at him.

Hoskins told Pinon to remain focused on Fletes. Hoskins scanned the area and "observed [Villareal] creeping along the west wall" of the shop. He ordered Villareal to show his hands but Villareal dropped them and walked away. When he "got towards the back of the cars there," he put his hands up, walked behind one of the cars closest to the wall and started up the next row of cars. "That's where he dropped his hands again." Hoskins again ordered Villareal to show his hands, and Villareal complied. He was handcuffed and taken out of the building.

Pinon was still in the same spot, "covering down" on Fletes. Hoskins told Pinon to walk back toward him. The officers told Fletes to crawl toward them, and he was taken into custody. Paramedics treated him for wounds to his hand and abdomen before he was taken by helicopter to the hospital.

Fletes was the last one out of the shop. No one entered after he was taken out. SWAT team members called into the building "for quite a bit of time" and then entered to "conduct a clear" of the warehouse, which was then secured until a warrant could be obtained.

Officers searched the shop the following morning. They found a loaded .38-caliber Smith and Wesson handgun just under the back bumper of a Corvette about five to seven feet away from where Fletes fell. "[M]ost everything in the shop" was covered with dust but the gun had no dust on it. There were streaks in the dust marks on the ground in the area around the gun. A silver-colored paint sprayer with a hose attached was found in a pool of blood where Fletes fell.

Officers found a loaded black .22-caliber Smith and Wesson semiautomatic firearm in the front seat of a black 1930's coupe in the area where Villareal was taken into custody. "Everything else in the vehicle was covered in a very thick layer of dust"

5

but "the gun was clean." There was also "a clean mark where it had slid down" on a windshield that someone had left in the coupe's front seat. Officers found a padded gun holder and nine-millimeter ammunition in the office of the shop. They found a black bag that contained .45-caliber ammunition behind a small refrigerator near the roll-up door.

Criminalist Josh Sehhat analyzed DNA samples taken from the guns and ammunition found in the shop. The DNA that was recovered had degraded, which made the results inconclusive.

On January 27, 2009, officers searched Fletes's Navajo Drive house. They found a blue Dallas Cowboys jersey with the number 31 and a newspaper article about gang activity in Salinas in the master bedroom. They also found photographs of Fletes and Villareal wearing gang attire. In the closet of another bedroom, they found nine pairs of work pants and seven work shirts with Villareal's name stitched in them. On a shelf above the clothes, they found a loaded .38-caliber semiautomatic handgun, a spare magazine with ammunition in it, and the internal mechanisms of a magazine for an assault rifle. They found paperwork with Villareal's name on it, gang-related drawings and artwork, and tattoo inks under the bed. The bed "looked like it had been slept in."

In a kitchen cabinet, officers found a baggie with "different rounds of ammunition" in it and prison correspondence addressed to Fletes next to a prescription medicine bottle with his name on it. In another kitchen cabinet, officers found a baggie with rounds of .22-caliber ammunition in it.

In the garage, officers found a backpack on the floor. Inside it was mortgage company correspondence addressed to Fletes, ammunition, and gang writings and lyrics. Officers also found a gun cleaning kit and the magazine for an assault weapon in the garage.

Pinon, Hoskins, Salas, and Plummer testified for the prosecution at trial. Other officers described the January 15, 2009 events and the subsequent investigation.

6

Salinas Police Officer Robert Zuniga testified as the prosecution's gang expert. Zuniga explained that "a lot" of the crimes that Sureño gang members commit in Salinas are "very violent" crimes ranging from shootings to carjackings to murders. He described seven predicate offenses committed by Sureño gang members, and certified court records reflecting the convictions were admitted into evidence. On January 12, 2009, two males in a green minivan challenged persons in a vehicle driving next to them and fired multiple rounds into the car when they responded, "'Norte.'" The driver of the car was killed. Sureño gang members Valentin Rivas and Benjamin Carrillo were convicted of murder with multiple gun and gang enhancements. On June 14, 2006, a Sureño gang member assaulted a peace officer with a firearm. Carlos Osuna was convicted of violating section 245, subdivision (d)(1). On June 22, 2006, a Sureño gang member brandished a firearm at a police officer. Ivan Rubio was convicted of assault on a peace officer and brandishing a firearm with a gang enhancement. On July 27, 2004, the driver of a stolen car evaded police and led them on a pursuit while his passenger fired rounds at them from the sunroof of the car. Sureño gang members Jose Monsivais and Marcos Amparo were convicted of crimes that included attempted murder of a peace officer, carjacking, shooting at an occupied vehicle, and assault with a firearm.

Three of the seven predicate crimes that Zuniga described involved Villareal and/or Fletes. On February 10, 2004, Villareal assaulted a fellow jail inmate with a "loaded" sock. He pleaded guilty to misdemeanor assault with a deadly weapon. On December 9, 2003, Villareal was found in possession of a loaded .22-caliber handgun at a Salinas street festival. He was convicted of being a felon in possession of a firearm and placed on felony probation with gang terms. On December 12, 2001, Fletes and another Sureño gang member were found in a vehicle with two stolen firearms. Officers also found magazines with live ammunition in the car. Fletes's fingerprints were on one of the magazines. He was convicted of being a felon in possession of a firearm with a gang enhancement.

7

Based on these predicate offenses and on his personal knowledge and experience with Norteño and Sureño gang members in Salinas, Zuniga opined that the Sureño criminal street gang engaged in a pattern of criminal activity. He further opined that Sureño gang members in Salinas know about that criminal activity because crimes in Salinas are "on the news constantly" and "most of the time gang-related incidents make the front page" of the newspaper. The crimes are also publicized by word-of-mouth because gang members boast about their crimes to enhance their reputations in the gang. Zuniga opined that the Sureño criminal street gang is a criminal street gang as section 186.22 defines the term.

Zuniga opined that Villareal was an active member of the Sureño criminal street gang in January 2009. He based his conclusion on Villareal's numerous Sureño gang tattoos (some of which were "clearly visible for the public to know that he's a gang member"), his many gang-related contacts with law enforcement (including a 2002 assault on a Norteño gang member and a June 2010 jail assault on a rumored Sureño dropout), the gang paraphernalia and the firearm found during the search of Fletes's Navajo Street house, and Villareal's various admissions of Sureño gang membership.

Zuniga opined that Fletes was also an active member of the Sureño criminal street gang in January 2009. He relied in part on Fletes's numerous gang-related contacts with police between 1975 and November 2001, when Fletes was sent to prison. In March 1995, police contacted Fletes after a rival gang member aimed a rifle at him and called out the rival gang's name. In August 1995, police responding to a report of shots fired at a Salinas residence found Fletes, several documented Sureño gang members, and a spent .38-caliber bullet. On another occasion in August 1995, police contacted Fletes and several documented Sureño gang members in a park after rival gang members called out their gang name and fired several rounds, hitting one of the Sureños in the back. On another occasion in August 1995, a Sureño gang member was shot at Fletes's house. Fletes initially lied to police about his involvement but eventually admitted it and said he

8

had thrown the gun over the fence. He was placed on probation. In September 1996, Fletes was walking with another Sureño gang member when a Norteño gang member fired shots at them, striking Fletes once in the leg. Zuniga stated that these incidents showed Fletes's active participation in the gang and his knowledge that gang members commit violent crimes.

In June 1997, Fletes was cited for driving without a license. His passenger, a known Sureño gang member on active probation, was arrested for possession of methamphetamine and marijuana. Fletes was contacted with other Sureños in September and December 1997. Zuniga stated that these incidents showed Fletes's active participation and association with a criminal street gang.

In April 1998, Fletes was arrested during a traffic stop for being in the company of another Sureño gang member in violation of the gang conditions of his probation. In November 1998, police executed simultaneous search warrants at the body shop (owned at the time by Fletes's brother) and at Fletes's residence. Drugs and multiple stolen firearms were found at the shop and additional stolen property and a loaded stolen firearm was found at Fletes's residence. Fletes was convicted of possession of stolen property and placed on felony probation. In July 1999, police contacted Fletes at a known Sureño gang area in the company of other Sureños in violation of his probation.

In November 2001, police attempted to make contact with an active Sureño gang member who was standing next to a van. The suspect fled. Police found Fletes and another active gang member in the van with two stolen firearms and a magazine pouch containing ammunition. Fletes's fingerprints were on one of the magazines. He was convicted of being a felon in possession of a firearm and sent to state prison.

Zuniga noted that Fletes was paroled in 2003 with gang terms but continued to associate with active Sureño gang members. In 2005, a Sureño died in a traffic accident in Salinas. When officers arrived, they found a loaded handgun in the waistband of the accident victim's pants and discovered that the car he was driving was registered to

9

Fletes. In 2008, a Sureño gang member was waiting in front of the body shop for a quote when unknown males shot and killed him. Zuniga also considered the fact that the white Altima taken during one of the January 2009 homicides was found at Fletes's shop.

Zuniga also relied on the photos and gang lyrics discovered during the search of Fletes's Navajo Drive residence and on a 2008 letter addressed to Fletes that was found in the master bedroom. The letter was from a documented Sureño gang member incarcerated for murder.

Zuniga noted that Fletes told the deputies who transported him to jail in 2009 that he was "a Southerner associate." Zuniga also described recordings of jail telephone calls placed to Fletes's number after his release on bail. Fletes accepted close to 200 collect calls from Villareal and other inmates in the jail's Sureño pod. Between 2009 and 2011, Fletes made monthly deposits of "[a]nywhere from 20 to a hundred dollars" to Villareal's jail account. He also put money on other Sureño inmates' jail accounts. These included the accounts of Jorge Luis Ruiz, a La Posada Trece gang member in custody for murder, and Edgar Maldonado, a La Posada Trece gang member in custody for attempted murder.

Zuniga described recordings of phone calls in which Fletes and Villareal spoke about other Sureño gang members. In one such call, Fletes said "Hey, somebody wants to talk to you" and handed the phone to another gang member. Zuniga recognized the voice of Villa, a "high-ranking La Posada Treces gang member" in Salinas. Zuniga explained that these calls showed that Fletes was "actively associating with a Sureño gang member, allowing that Sureño gang member to talk to a Sureño gang member who's incarcerated. It shows that networking session. It shows that they are clearly associating together."

Zuniga testified that he reviewed recordings of other Sureño inmates' telephone conversations with Fletes. In one "fairly long" conversation, a documented gang member asked Fletes for money and Fletes responded "that he would take care of him." Fletes had another "fairly lengthy conversation" with another "well-known La Posada Treces

10

Sureño gang member" from Salinas.  At least four other inmates from the Sureño pod also called Fletes.  "Again, another Sureño gang member, who's incarcerated in a Sureño-only housing facility, making a phone call to Mr. Fletes shows that association" with the Sureño criminal street gang.

Based on a hypothetical question that closely tracked the facts shown by the evidence, Zuniga opined that the gang members described in the hypothetical possessed weapons and ammunition for the benefit of or in association with a criminal street gang. "[Y]ou have two Sureño gang members who are working in concert to commit a crime to possess the firearms. . . .  [A] firearm is a tool of the trade for gang members.  It benefits the individual's reputation within the Sureño criminal street gang to possess firearms.  It also benefits the gang -- having these Sureño gang members . . . possessing these firearms, it benefits that gang's reputation."

Retired university professor Malcolm Klein testified as a gang expert for the defense.  He had been involved in gang research "off and on" since 1962, was a consultant to the United States Department of Justice's National Gang Center, and described himself as a "generic gang expert."  He had never been to Salinas.  He had never heard of the La Posada Trece gang.  He had never talked to Salinas gang members.  He did not interview or speak with Fletes.

Klein opined that Fletes was "probably" not an active gang member in January 2009.  Fletes was 28 at the time, had obtained an early release from parole, and had not been rearrested "for some five years" after his release.  In Klein's view, Fletes "had formed . . . essentially, a new life for himself" and "was becoming a gang-reformer type." Klein said that it is "quite common" for ex-gang members to try "to intervene in the lives of current gang members to get them out," although he did not see much evidence that Fletes's purported reformist efforts were "working" with Villareal.

Klein acknowledged that some gang reformers "have gone bad later on."  He conceded that putting money on gang members' jail accounts "could be" an indication of

11

a return to the gang lifestyle. He agreed that it would be "a wise move" for someone trying to disassociate himself from a gang to get rid of gang clothing and gang indicia. He said it would be "[s]tupid" to be photographed with an active gang member who was wearing gang clothing, and "[i]t wouldn't be smart" to keep letters from Sureño gang members. "Normally," it would not be wise for a person trying to disassociate from a gang to let an active gang member live with him and his family.

Fletes's wife Sandra Fletes testified that he was released from parole in June 2005 and later took over his family's auto body shop. He was at the shop "12 hours or more a day" except for Sundays, which were spent with the family. She first met Villareal when Fletes invited him to dinner. His relationship with Fletes was work-related in the beginning but the two later became "close." She believed that Fletes saw Villareal "as someone he wanted to . . . mentor and just help." They included Villareal in family functions, and Fletes helped him get a job. "[H]e became like a family member" and stayed at their home several times a week.

Sandra Fletes said she never saw guns or bullets in the kitchen of the Navajo Street house. She never saw gangster lyrics or noticed the green backpack or the gun magazine in the garage. She never saw Fletes with a gun or ammunition. She worked in the office of the shop "maybe once a week" in January 2009, organizing papers and "trying to get a filing system going." She never saw ammunition in a filing cabinet.

Jason Fries testified that he created a computer animation to illustrate the opinions of the defense's forensic analysis expert, Kenton Wong. The animation was played for the jury.

Forensic analysis expert Wong opined that the bullet's path through Fletes's body was consistent with Fletes's account of events and inconsistent with Pinon's account. Wong based his trajectory analysis on descriptions in Fletes's medical records, on measurements of Fletes's body taken three years after the incident, and on Fletes's recollection of his position at the time.

12

Fletes testified in his own behalf. He admitted that he was a member of the La Posada Trece Sureño gang in his teens and early twenties, hanging out with the wrong crowd and committing crimes. He said his attitude changed when he was sent to prison in 2001. When he was paroled in 2003, he committed himself to changing his life "in a positive way." He did not formally drop out of the gang because that requires debriefing by law enforcement and he feared retribution by active gang members.

Fletes worked in his brother's auto shop after his release from prison and eventually took over the business. Sureños are among his customers because "you can't reject customers that come into your place of business wanting you to fix their cars." He met Villareal when he came in for an estimate. They became friends. He hired Villareal to do odd jobs. He introduced him to his family and invited him to join in family activities. He found Villareal to be "kind of lost, kind of confused." Fletes "wanted to show him that there was another life, instead of the one that he grew up around." "I would tell him to leave that behind."

Fletes testified that he stayed late on January 15, 2009, to paint the bumper and the grill of a show car. Villareal was at the shop waiting for a ride home. The job required "[a]round ten coats" of paint. Fletes was outside talking to Villareal between coats when they saw a car "driving by, and real slow." It went to the end of the lot and drove by again. Fletes went back to his painting. He "grabbed the paint sprayer," connected the air hose, and started spraying. He "kind of felt a presence or sensed something and I just turned, and then boom, that's all I heard." He "fell down like a sack of cement" and felt "a lot" of pain in his hand and stomach. He did not understand what had happened. He did not recall where his hands were when he was shot.

Fletes said that he did not hear Pinon yelling at Villareal. He denied pointing a gun at Pinon or having a gun in his hand. He denied seeing either of the guns that were found in the shop at any time earlier that day. On cross-examination, he said it was "possible" that he would have seen the gun under the Corvette had it been there earlier

13

that day. "I don't know how that gun got there, but somebody put that gun there." Fletes said that he did not see Villareal with a firearm that day. He acknowledged that from the time he was shot until the time the SWAT team entered the shop, the only people who were inside were the four gang task force officers (Pinon, Salas, Hoskins, and Plummer), Villareal, and himself. He was then asked, "Are you saying that the officers put that gun there?" He responded, "Yes." It was his belief that the officers planted both guns. He conceded that he had no evidence to support that claim.

Fletes claimed that he never saw the bullets found in the filing cabinet in the office of the shop. He did not put them there or allow anyone to put them there. He "would have thrown them away" had he seen them.

Fletes admitted that he was living in the Navajo Street house on January 15, 2009, but he said that he was no longer living there when police searched it. The house was being repossessed, and he let someone else live there until the bank took it over. He knew "nothing" about the bullets found in the house. He never saw clips or magazines there. He had nothing to do with the gun-cleaning kit, which belonged to his brother-in-law.

Fletes admitted hanging around with rappers as a teenager. He had "the equipment, the computer, the reel to reel, the keyboard, and the beat maker." He did not write the lyrics that were found in the garage of his Navajo Street house. His only involvement with the lyrics was to "break down the raps" and "put beats behind everything." That was before he went to prison. He remembered seeing the lyrics at his mother's house. When he was released from prison, he moved "all my stuff that I had in my mom's garage that was in boxes to my Navajo address." He did not know how the lyrics or the envelope from the mortgage company bearing his name got into the green backpack found in the garage of his Navajo Street house.

Fletes maintained that the references in the lyrics to "Carlos," "Carlitos," and "Mr. C" were to "another guy" named Carlos. He did not know why a Sureño gang

member addressed him as "Evil C" in the letter he wrote to him from jail in 2008. He acknowledged that one gang lyric said "Carlos Fletes." He acknowledged listening to some of the recorded jail calls from Villareal and other Sureño inmates but denied hearing any references to himself as "Carlitos."

Fletes testified that the white Altima was parked on the street outside his shop because "they said something had happened and they just needed somewhere to park it." That conversation occurred on "the day before this [January 15, 2009] incident."

Fletes admitted that he put "[a] hundred dollars" on Villareal's jail account "[a]bout three times." Villareal called him from jail "a lot"—"at least three or four times a week." Fletes did not recall whether Villa joined in one of his conversations with Villareal. Fletes said he did not accept most of Villareal's calls. He "just wouldn't pick up." His wife accepted calls from Villareal. Fletes found out "after the fact" that she also put money on other Sureños' jail accounts.

The jury returned guilty verdicts against both defendants on all but the assault counts and found the gang enhancement allegations true. Fletes admitted a prior serious felony strike conviction. The trial court sentenced him to 15 years in prison. The court sentenced Villareal to five years in prison. Defendants filed timely notices of appeal.

## II. Discussion

### A. Substantial Evidence Challenges to Gang Findings

Defendants challenge the sufficiency of the evidence to support the true findings on the gang enhancement allegations and their convictions for active participation in a criminal street gang.

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.]' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is

15

reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

## 1. Evidence Supporting Gang Enhancements

Defendants claim there was insufficient evidence to support the true findings on the gang enhancement allegations. We disagree.

Section 186.22, subdivision (b)(1) authorizes a sentencing enhancement when a defendant was convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." The first prong requires that the offense be "'"gang related."'" (*Albillar*, *supra*, 51 Cal.4th at p. 60.) "Expert opinion that particular criminal conduct benefited a gang . . . can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" (*Albillar*, at p. 63.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).) The second prong of the enhancement statute requires that the offense be committed with "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar*, *supra*, 51 Cal.4th at p. 67.) "'There is no statutory

16

requirement that this "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.'" (*Id.* at p. 66.)

The jury could reasonably have concluded that defendants' firearm possession offenses were ""'"gang related."'"" (*Albillar*, *supra*, 51 Cal.4th at p. 60.) There was ample evidence that both were gang members. Villareal admitted that he was a Sureño and had been since he was about 11 years old. There was evidence that Fletes had fallen back into the gang notwithstanding his assertion that he committed to changing his life when he was paroled from prison. He testified that he never formally disassociated from the gang. He admitted to jail deputies in 2009 that he was "a Southerner associate." He invited Villareal, an active gang member, into his home. He made regular deposits to Villareal's and other Sureño gang members' jail accounts and accepted numerous collect calls from them. Gang items were found during the search of his Navajo Drive residence. A Nissan Altima taken during one of the January 2009 homicides was found at his body shop. A reasonable factfinder could conclude from this evidence that Fletes's continuing association with Sureño gang members went far beyond his claimed reluctance to refuse to do business with Sureño customers. There was substantial evidence that both defendants were members of the Sureño gang.

There was also evidence that possession of firearms by Sureño gang members benefits the gang. Zuniga explained that firearms are gang members' tools of the trade. Gang members possess them "because of the capability to use [a firearm] as an offensive tool and as a defensive tool." "Offensive should the opportunity arrive . . . where they're able to use a gun to commit a crime, they have that opportunity, it's readily accessible to them." Firearms are so important to the gang that "being a convicted felon, or a prior felon, and not being able to possess a firearm, these gang members know if they are caught possessing a firearm, there's a severe consequence for that. But yet they still choose to carry these firearms, they still choose to be in possession of them to benefit the

gang." "Gang members will go out and commit crimes to make the gang stronger." "A lot" of the crimes that gang members commit in Salinas are "very violent" crimes involving firearms. "[A] lot of the reason why these gangs exist here is . . . fear and intimidation." "[T]o them that equals power. By installing [*sic*] fear in rival gang members, . . . fear in the community, it . . . equals power to these individuals and these gangs. That's what enables them to continue to be a gang here . . . ." "[H]aving these Sureño gang members taking that opportunity and possessing these firearms, it benefits that gang's reputation."

Finally, there was evidence of defendants' apparent willingness to engage with persons defendants suspected were rival gang members. Hoskins testified that the atmosphere in Salinas was "very hot that January, which means that there's . . . a lot of rival activity going back and forth." Fletes testified that he was aware of the gang war and knew that five homicides had occurred in the first two weeks of January 2009. When "two male Hispanics" drove slowly past the shop that January evening, Fletes suspected that they might be gang members. He and Villareal discussed it. Yet both remained outside the well-lit shop. Villareal retrieved a firearm from the stack of tires "and started squatting down." Both defendants had their hands at their waistbands. When the unmarked car drove up to the roll-up door the third time, Villareal "was in a . . . fight or flight stance." He "was reaching into his waistband." A reasonable factfinder could conclude that defendants' actions indicated a willingness to engage with the suspected rival gang members. In sum, a reasonable factfinder could conclude that defendants' firearm possession offenses were " " "gang related" " " and that the first prong of the enhancement allegation statute was satisfied. (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

The jury could also reasonably have concluded that the second prong of the enhancement statute was satisfied because defendants had the requisite specific intent to avoid confiscation of their guns and thus to maintain their illegal possession of them. We have already described the evidence that supported an inference that defendants were

18

armed and willing to engage with the suspected rival gang members rather than to withdraw by going inside and closing the roll-up bay door. (*Ante*, p. 18.) There was also evidence that when defendants saw the marked vehicle, both "immediately" turned and ran, each holding his waistband. The jury could reasonably infer that this too showed their intent to maintain their illegal possession of the guns. The jury could reasonably infer from defendants' "close" friendship and from the fact that they discussed the suspicious car that they also discussed the fact that they were both armed. Even if defendants did not discuss the fact that they were armed, the jury could infer from defendants' actions and demeanor outside the shop that night that each was aware that the other was armed. It could reasonably infer from defendants' flight that they understood that neither was permitted to possess a firearm and that they fled to avoid having those firearms confiscated. Finally, it could infer that each intended to assist the other in maintaining his unlawful possession of a firearm, either by evading capture entirely or by putting the guns where police might not find them. Such an inference is bolstered by the fact that Villareal said "something to the rear of the warehouse" as he ran from Pinon. Those words could only have been directed to Fletes, since he and Villareal were the only two besides Pinon in the warehouse at the time. The inference that each intended to assist the other in maintaining his unlawful possession of a firearm is further bolstered by the fact that those firearms were later found where police would not necessarily spot them quickly in the car-packed shop. All of this evidence supported an inference that defendants acted with the specific intent to promote, further, or assist each other's criminal conduct in retaining possession of their illegally-possessed firearms. Substantial evidence thus supported the true findings on the gang enhancement allegations.

Villareal argues that apart from Zuniga's opinion, there was "no evidence" that he possessed the .22-caliber firearm for the benefit of, at the direction of, or in association with any criminal street gang. The record refutes his argument. Zuniga's testimony was not the only evidence the jury heard on the issue. We have already described the

19

evidence that, when considered in light of Zuniga's testimony, supported a conclusion that defendants possessed the firearms for the benefit of the Sureño gang. (*Ante*, pp. 17-19.)

Villareal contends that Zuniga's "opinion concerning [Villareal's] specific intent in possessing the .22 handgun improperly went to the ultimate issue to be decided by the jury." Not so. Villareal's reliance on *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*) and *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*) is misplaced. In *Frank S.*, the court held that the prosecution's gang expert should not have been permitted to testify "that a specific individual possessed a specific intent." (*Franks*, at p. 1197.) The court concluded that because the expert's testimony was "the only evidence" of the defendant's intent, the true finding on the enhancement allegation was not supported by substantial evidence. (*Id.* at pp. 1197-1199.) In *Ramon*, the court held that "[t]he facts on which [the gang expert] based his testimony were insufficient to permit him to construct an opinion about Ramon's specific intent in this case. His opinion, therefore, cannot constitute substantial evidence to support the jury's finding on the gang enhancement." (*Ramon*, at p. 852.) Both of these decisions relied on *People v. Killebrew*, which our high court has since limited. (*People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved in part in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*).)

In *Killebrew*, a gang expert testified through hypothetical questions about "the subjective *knowledge and intent*" of each of 11 occupants in three vehicles. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658.) The court held that it was error to admit the expert's testimony because issues of subjective knowledge and intent are properly reserved for the trier of fact. (*Killebrew*, at p. 658.) The court further held that because the expert's testimony was the only evidence offered to establish the elements of the defendant's alleged conspiracy to possess a handgun, no substantial evidence supported his conviction. (*Id*. at pp. 660-661.)

20

*Killebrew*'s holding was limited in 2011 by the California Supreme Court in *Vang*. (*Vang*, *supra*, 52 Cal.4th at p. 1046.) The *Vang* court noted that the *Killebrew* decision "never specifically state[d] whether or how the expert referred to specific persons, rather than hypothetical persons." (*Vang*, at p. 1047.) The court further noted that "[o]bviously, there is a difference between testifying about specific persons and about hypothetical persons." (*Ibid.*) The court expressly disapproved "of any interpretation of *Killebrew* . . . as barring, or even limiting, the use of hypothetical questions. Even if expert testimony regarding the defendants themselves is improper, the use of hypothetical questions is proper." (*Vang*, at p. 1047, fn. 3.)

The expert in *Vang* testified (in response to hypothetical questions based on facts shown by the evidence) that an assault was a "'gang-motivated'" attack. (*Vang*, *supra*, 52 Cal.4th at p. 1043) The high court held that the expert's testimony was properly admitted. "The expert did *not* give an opinion on whether defendants did commit an assault in that way, and thus did *not* give an opinion on how the jury should decide the case." (*Vang*, at p. 1049.) So too here. Here as in *Vang*, Zuniga "did *not* give an opinion on how the jury should decide the case." (*Ibid*.) His opinions were provided in response to hypothetical questions about "two Sureño gang members, A and B." Zuniga did not tell the jury how to decide the case. There was nothing improper about his testimony. (*Vang*, at p. 1049.) We reject Villareal's challenge to Zuniga's testimony.

Fletes argues that there was no substantial evidence about his intent because there was "no evidence about the circumstances in which [he] obtained dominion over the gun or ammunition" and "no evidence that [he] had participated in any unlawful gang activity" since his release from prison. We do not find these claimed deficiencies in the evidence important. There was ample evidence from which the jury could conclude that Fletes possessed the firearm. His hands were at his waistband when Pinon and Salas drove by and he held his waistband as he ran from Pinon (which Hoskins described as "a

21

very distinctive look" and a "huge indicator" that a gang member is armed).  A loaded .38-caliber firearm was found just feet from where Fletes fell after being shot.

There was also ample evidence from which the jury could conclude that Fletes possessed the ammunition.  It was found in the office of his body shop and behind a small refrigerator near the roll-up door of the auto body shop that he owned.  The jury could reasonably have concluded that these are areas that a shop owner is likely to frequent.  It could reasonably have disbelieved Fletes's self-serving testimony that he was unaware of the ammunition in the shop and would have thrown it away had he been aware of it.

Moreover, Fletes would still possess the ammunition even if someone else put it where it was found.  "Possession may be physical or constructive, and more than one person may possess the same contraband." (*People v. Williams* (2009) 170 Cal.App.4th 587, 625 (*Williams*).)  Possession can be imputed when the contraband is found in a place that is immediately accessible to the joint dominion and control of the accused and another. (*People v. Newman* (1971) 5 Cal.3d 48, 53 (*Newman*), disapproved on another ground in *People v. Daniels* (1975) 14 Cal.3d 857, 862.)  Here, Fletes unquestionably possessed the firearms and ammunition found in his shop, and there was ample evidence from which the jury could reasonably have concluded that did so to benefit the Sureño gang, with the specific intent to further criminal conduct by Sureño gang members. (*Williams*, at p. 625; *Newman*, at p. 53.)

### 2. Evidence Supporting Substantive Gang Crime Convictions

Defendants claim that their substantive gang crime convictions must be reversed because there was no substantial evidence to support the third element of the offense.  We disagree.

"The elements of the gang participation offense in section 186.22(a) are:  First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion,

22

furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.]" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).) "[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. [Citation.]" (*Rodriguez*, at p. 1132.) A gang member who acts alone in committing a felony does not violate the gang participation statute. (*Rodriguez*, at p. 1139.)

Relying on *Rodriguez*, defendants argue that in the absence of evidence that either knew that the other possessed a gun, "it cannot be rationally inferred that [he] intended to encourage or assist the [other's] commission of a felonious offense." The argument fails because there was ample evidence from which the jury could rationally infer that each knew the other was armed that night. There was testimony that Villareal was "like a [Fletes] family member" and that he and Fletes had a "close" friendship. There was evidence about the "unusually large number of gang-related shootings back and forth between Norteños and Sureños" that January. Fletes testified that he was aware of the ongoing "gang war" and that he became suspicious when two Hispanic males drove slowly by the shop that night. He suspected that they might be gang members. He and Villareal discussed the suspicious car. The jury could reasonably infer from this evidence and from the fact that defendants remained outside despite their suspicions about the car that they had also discussed the fact that they were both carrying guns that night.

Even if they did not speak about it, there was ample evidence from which the jury could infer that each knew from the other's actions and body language outside the shop that night that the other was carrying a gun. Defendants were outside together when Pinon and Salas drove by the shop the first time. They were still outside when the officers drove by a second time five to 10 minutes later. Defendants had their hands at their waistbands. Defendants were still outside together when the officers returned a

23

third time seven to 10 minutes later. Pinon, Salas, and Hoskins described defendants' actions, their stances, and the position of their hands outside the shop that night in detail. The jury could reasonably infer from that testimony that each defendant saw something during that approximately 20-minute period to confirm that his friend was carrying a gun.

Fletes argues that even if he knew Villareal possessed a firearm, there was "no evidence that [he] intended to promote, assist or further [Villareal's] possession of a gun." The argument misstates the standard. Specific intent is not an element of the substantive gang offense. (§ 186.22, subd. (a); see *Rodriguez*, *supra*, 55 Cal.4th at p. 1130 & fn. 5.) The third element of the statute requires that the defendant "willfully promote[], further[] or assist[] in any felonious criminal conduct by members of the gang." (§ 186.22, subd. (a).) "[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct." (*Rodriguez*, at p. 1132.) "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act . . . ." (§ 7.) "The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, at p. 1132.)

Those requirements were satisfied here because the jury could reasonably have concluded that defendants acted in concert to further or assist each other's felonious criminal conduct of possessing a firearm. (§ 186.22, subd. (a).) It could reasonably infer that defendants jointly possessed the .22-caliber firearm that Villareal retrieved from the stack of tires. The firearm was not registered to either defendant.[4] It was on Fletes's

---

[4] The parties stipulated that the registered owner of the .22-caliber firearm that Villareal was convicted of possessing would testify that he sold it to a friend 10 years earlier. They further stipulated (1) that the friend would testify that he later sold the gun and (2) that the person to whom he sold it would testify that he sold it, that he did not remember when or to whom he sold it, and that he did not know either of the defendants in this case. The parties also stipulated that the registered owner of the .38-caliber

24

property, in a spot where Fletes and Villareal both had access to it.  (E.g., *People v. Nieto* (1966) 247 Cal.App.2d 364, 366-367.)  Ammunition for a .22-caliber firearm was found at Fletes's Navajo Drive residence in a kitchen cabinet where both Fletes and Villareal had access to it.  Zuniga testified that gang members' firearms are often obtained by burglary, are not registered to the gang members, and can be passed around from one gang member to another.

The jury could reasonably have concluded that defendants' flight at the sight of Hoskins's marked vehicle was a willful act that furthered or contributed to their continued felonious possession of the firearms.  When *both* ran from Pinon, each doubled his chance of avoiding confiscation of at least one of the weapons.  Fletes had an opportunity to escape or to secrete the firearm he was carrying while Pinon was focused on Villareal.  When Pinon lost sight of Villareal and was suddenly distracted by Fletes, Villareal's chances to escape or to secrete the firearm he was carrying increased.  The jury could reasonably infer from the fact that Villareal said something to Fletes as both ran from Pinon that the two were acting in concert.  The fact that the firearms were found where police would not immediately spot them in the car-filled shop further supports a conclusion that defendants acted in concert to promote, further or assist each other's felonious criminal conduct.  We conclude that there was substantial evidence to support the third element of the substantive gang offense.

## B.  Challenges to the Admission of Gang Evidence

### 1.  Evidence of Villareal's Participation in a Jail Stabbing

Villareal contends that the trial court abused its discretion under Evidence Code sections 352 and 1101 and violated his federal and state constitutional rights by allowing

---

firearm that Fletes was convicted of possessing would testify that it was stolen from him in Los Angeles in 2000.

Zuniga to testify that his opinions were based in part on evidence that Villareal participated in an attack on another Sureño inmate at the Monterey County Jail.

### a. Background

The prosecutor moved in limine to admit evidence that while Villareal was awaiting trial in this case, he and a fellow Sureño attacked another inmate and stabbed him "over 30 times" with a shank made from a fourth Sureño inmate's medical brace. The victim believed the attack was triggered by his rumored cooperation with law enforcement. Villareal was charged with attempted murder and his case was pending when this case went to trial.

The prosecutor argued at the in limine hearing that the evidence was admissible to show Villareal's active participation in the Sureño gang. Villareal's counsel objected that it was cumulative and highly prejudicial. He asked the court to sanitize the evidence if the court was not inclined to exclude it entirely under Evidence Code section 352. Fletes's counsel also objected, asserting among other things that the evidence was "irrelevant as to [Fletes]," inflammatory, and violative of Fletes's due process rights.

The trial court found that the evidence was highly probative but that the viciousness of the attack was "clearly . . . prejudicial in an inappropriate way." "So, the details are not coming in." "So, the Court's ruling is assault with a deadly weapon and no details as to the violent specifics." "[T]he other parts of it … I assume it's in the jail. I assume that there [is] . . . at least one other . . . Sureño involved; that . . . there is information that would provide the proper setting and the proper flavor." "[I]f there's something inconsistent with that idea, then we need to talk about it. But right now . . . from what I know of it, the circumstances surrounding it are admissible, at least may be relied on by the expert and if there is proper examination of the expert that elicits that kind of information . . . ." The court ruled that the evidence was also admissible against Fletes "in the sense [that] one element of the offense or the enhancements . . . is association with someone who is an active participant, a member of a gang, and this

would be relevant for that purpose."  "[T]he evidence will be admissible . . . against both defendants."

The court had earlier emphasized that its in limine rulings were all tentative and subject to reevaluation "if there's an objection in the context of the evidence as it stands at the time."  Before they presented their opening statements, both defense counsel summarily and very generally renewed their previous objections.  The trial court overruled them, "[h]aving heard no particular specific that would alter the calculations previously made."  The court reiterated that "[i]f there is some specific item with specific aspects that you feel need further discussion, be specific."  Opening statements were then presented.  Two weeks later, Zuniga testified without objection that the jail assault was one of the many bases for his opinion that Villareal was an active member of the Sureño criminal street gang on January 15, 2009.

### b.  Analysis

Villareal argues that the trial court should have excluded evidence of the jail assault as irrelevant, cumulative, and unduly prejudicial under Evidence Code section 352.  We disagree.

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  "Except as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, § 351.)  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence."  [Citations.]  "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors.  [Citation.]"  [Citation.]'  [Citation.]  In other

27

words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' " (*People v. Scott* (2011) 52 Cal.4th 452, 491 (*Scott*).)

"[N]either the prosecution nor the defendant has a right to present cumulative evidence that creates a substantial danger of undue prejudice [citation] or that unduly consumes the court's time [citation]." (*Williams*, *supra*, 170 Cal.App.4th 587, 611.) But "no bright-line rules exist for determining when evidence is cumulative . . . . [A]pplication of the term must be reasonable and practical." (*Ibid.*) We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*Id.* at p. 606.) "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." (*People v. Valdez* (1997) 58 Cal.App.4th 494, 511 (*Valdez*).)

Even if we assume that Villareal preserved his objection to the jail assault evidence, there was no abuse of discretion here. The evidence was relevant as a basis for Zuniga's opinion that Villareal was an active gang member on January 15, 2009. It was highly probative because evidence that he engaged in gang-related activities both before and after January 15, 2009, strongly supported an inference that he was an active gang member on the date itself. As the trial court noted moreover, evidence that Villareal joined with other Sureños to commit a violent act was probative "in a way that is different from simply being housed in a [Sureño] gang pod." This qualitative difference refutes Villareal's argument that the evidence was cumulative.

The probative value of the jail assault evidence was not "substantially outweighed" by its potential for prejudice. (Evid. Code, § 352.) The evidence was significantly sanitized, with all mention of "blood, cuts, number of stab wounds, and that

28

sort of thing" excluded. The vicious attack was described simply as an assault with "a shank" or "jailhouse makeshift knife." Testimony about the incident was very brief, consuming only two of the 6,000 reporter's transcript pages devoted to the presentation of the evidence. Permitting Zuniga to testify about the jail assault did not exceed the bounds of reason. (*Valdez*, *supra*, 58 Cal.App.4th at p. 511.) It was not an abuse of discretion.

Villareal argues that the evidence was unduly prejudicial because it revealed that he was in custody. His failure to assert this argument below has forfeited it on appeal. (*People v. Pearson* (2013) 56 Cal.4th 393, 460.) We do not find it persuasive in any event. The jury was already aware that he was in custody, having heard that he obtained the most recent of his facial gang tattoos there. There was additional testimony that gang members visited him in jail, that his numerous calls from the jail were recorded, and that Fletes made regular deposits to his jail account. All of this testimony was received without any objection that it revealed Villareal's in-custody status.

Villareal claims the evidence was cumulative and unduly prejudicial because his gang membership was "undisputed" in light of his tattoos and his request to be housed in the Sureño pod of the jail. Even if we assume that he preserved this argument for appeal, we cannot agree that the issue was undisputed. There was no stipulation that Villareal was an active gang member. Neither the prosecutor nor the trial court knew at the in limine stage whether Villareal's alleged gang membership would be vigorously challenged or tacitly conceded at trial. Even if it was conceded, "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." (*Estelle v. McGuire* (1991) 502 U.S. 62, 69-70.) The trial court could not reasonably discount the possibility that Villareal would argue at trial that he obtained most of his tattoos many years earlier and/or that he was (as a result of Fletes's claimed efforts to reform him) in the process of disassociating from the gang on the date of the charged crimes. Nor could the court

29

assume that Villareal's tattoos and his request for Sureño housing would be sufficient to establish beyond a reasonable doubt that he was an active gang member on January 15, 2009. Permitting Zuniga to testify about the jail assault was not an abuse of discretion.

Villareal argues that the trial court should have excluded the jail assault evidence as improper character evidence under Evidence Code section 1101. We disagree.

Evidence of a defendant's character in the form of specific instances of his or her conduct is inadmissible to prove the defendant's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) However, such evidence is admissible if relevant to prove some fact (such as motive or intent) other than the defendant's disposition to commit such an act. (Evid. Code, § 1101, subd. (b).) To be relevant on the issue of intent, the uncharged crimes need only be "sufficiently similar [to the charged offenses] to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) " 'If evidence of an uncharged offense is relevant, there is no distinction between an offense that is *prior* and one that is *subsequent* to the date of the charged offense.' [Citation.]" (*People v. Balcom* (1994) 7 Cal.4th 414, 425.) The trial court has discretion to admit such evidence after weighing its probative value against its prejudicial effect. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668 (*Fuiava*).)

The jail assault evidence was relevant on the issue of Villareal's motive and intent for purposes of the gang enhancements in this case. In the jail incident, Villareal acted in concert with other Sureños to commit a violent assault on a rumored gang dropout. Zuniga explained that dropouts are "the lowest of the low" in the gang culture. Active gang members do not trust them and will often assault them "so that they are removed from that housing facility." A reasonable factfinder could infer from this evidence that Villareal committed the jail assault for the benefit of the gang with the specific intent to further criminal conduct by gang members. That, in turn, was probative of his intent and

30

motive on the assault on a peace officer with a firearm count. Zuniga testified that firearms are "tools of the trade" that gang members possess "for their capability to be used as an offensive tool . . . ." He explained that police officers are considered "road blocks" or "hurdles" to gang members' ability to conduct "their business as normal." He noted that Villareal's Long Beach gang had "an extensive history of challenging law enforcement and committing assaults on law enforcement" and that in Salinas as well, various Sureño gang members had challenged and assaulted police officers. A key issue at trial was whether the charged assault on Pinon was committed for the benefit of the gang with the specific intent to further criminal conduct by gang members.

The jail assault evidence had some tendency in reason to show that it was. We reject Villareal's argument that there was "nothing similar" about the two incidents. Both the jail assault and the charged assault involved gang members acting together to commit violent acts to remove a perceived impediment to the gang's success. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) In our view, the jail incident and the charged offenses were "sufficiently similar . . . to support the inference that [Villareal] ' " 'probably harbor[ed] the same intent in each instance." [Citations.]' " (*Ewoldt*, at p. 402.)

Any potential prejudice was mitigated by the trial court's repeated reminders throughout Zuniga's testimony that "the incidents that he's basing his opinion on, the information that he receives from reports, from other people . . . is . . . not being offered for the truth . . . [but] only for the purpose of helping you understand on what basis he reached his opinion." "So you can only use it for that purpose." The trial court also instructed the jury that it could not use any "gang-related" evidence to "conclude . . . that the defendant is a person of bad character or that he has a disposition to commit crime." We presume that the jury understood and followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 723 (*Edwards*).)

31

Villareal argues that admission of the jail assault evidence rendered his trial fundamentally unfair in violation of his right to due process. We disagree. "'[A]pplication of the ordinary rules of evidence generally does not impermissibly impinge on a . . . defendant's constitutional rights.'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must be 'of such quality as necessarily prevents a fair trial.' [Citation.]" (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.) Since we have concluded that admitting the jail assault evidence was a proper exercise of the trial court's discretion, we find no due process violation. (*People v. Yeoman* (2003) 31 Cal.4th 93, 122-123 (*Yeoman*).)

## 2. Evidence of Fletes's Active Gang Membership

Fletes complains that the trial court admitted an overabundance of "cumulative, irrelevant and unreasonably prejudicial gang evidence" over his Evidence Code section 352 objection to explain the bases of Zuniga's expert opinions. He divides the evidence into five categories: (1) evidence of his participation in gang activity before 2002; (2) evidence of his "proximity" to Sureño gang members and activity after he was paroled in 2003; (3) evidence about Villareal's gang activities; (4) evidence of predicate offenses; and (5) Zuniga's two brief references to the Mexican Mafia. We address each in turn.

### a. Evidence of Fletes's Active Gang Membership Before 2002

Fletes contends that the trial court abused its discretion by allowing Zuniga to explain how Fletes's involvement in gang activity before 2002 supported his expert opinions. He argues that none of that evidence made it more likely "in any but the most tenuous sense" that he remained an active gang member or that he acted to advance criminal conduct by gang members on January 15, 2009. Instead, its impact was to incline jurors to convict him "based on his ostensible bad character." We reject these contentions.

32

Contrary to Fletes's assertion, the pre-2002 evidence was both relevant and probative. The section 186.22, subdivision (a) charge required the prosecutor to prove Fletes's "active participation in a criminal street gang, in the sense of participation that is more than nominal or passive," his "knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity," and his "willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1130.) The enhancement allegation required the prosecutor to prove that the January 15, 2009 offenses were " ' "gang related" ' " and that Fletes committed them "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (*Albillar*, *supra*, 51 Cal.4th at p. 60; § 186.22, subd. (b).) Evidence of his pre-2002 gang activities was probative of these issues. (*People v. Tran* (2011) 51 Cal.4th 1040, 1048 (*Tran*).) It was relevant as a basis for Zuniga's opinions. It showed Fletes's immersion in and dedication to the gang before he went to prison. It provided the jury with a context in which to view his later gang contacts and his assertion that he changed his life when he was paroled from prison. It thus had some tendency in reason to prove elements of the prosecution's case and to disprove a defense theory of the case. (Evid. Code, § 210)

Zuniga's testimony about Fletes's pre-2002 gang activities was not unduly prejudicial. It did not consume an unreasonable amount of time. It was not confusing. Nor was it likely to inflame the jury. The most serious incident, a 1995 shooting at Fletes's house, was sanitized to remove potentially inflammatory details. The jury heard only that "a Sureño was a victim of a shooting" at Fletes's house in August 1995, that Fletes initially lied to police about his "involvement," that he later told them he threw the gun over the fence, and that he was placed on probation. In three other incidents, Fletes was the target rather than the aggressor. In our view, these incidents were no more inflammatory than the charge of assaulting a police officer with a firearm. As our high court has observed, the potential for prejudice is decreased when it "is no stronger or

33

more inflammatory than the testimony concerning the charged offense." (*Tran*, *supra*, 51 Cal.4th at p. 1047.) Further, the trial court instructed the jury on the limited purpose of the evidence and issued repeated reminders during Zuniga's testimony. The jury was also instructed that it could not use any gang evidence to conclude that either defendant had a bad character or a disposition to commit crime. On this record, the trial court's decision to allow expert testimony about Fletes's pre-2002 gang involvement was not an abuse of discretion.

Fletes maintains that the evidence was cumulative because *other* evidence "unequivocally showed that he had extensive and close association with Sureño gang members, that he was aware the Sureños were a criminal gang, and that its members engage in or have engaged in a pattern of criminal gang activity." He cites his own testimony about his early gang membership, photos showing him in "ostensibly gang clothing" and with other gang members, his possession of gang lyrics, his "several" telephone conversations with and visits to Villareal in jail after January 15, 2009, and the deposits that he made to Villareal's and other Sureños' jail accounts.

We see two problems with Fletes's argument. The first is that the evidence he claims would have been sufficient was not nearly as strong from a prosecution standpoint as the evidence he deems cumulative. Fletes cites no authority for the proposition that the prosecution must forgo the use of relevant, persuasive evidence to prove an element of a crime because that element might also be established through other evidence. We are aware of none. (*Tran*, *supra*, 51 Cal.4th at p. 1049 [rejecting a similar argument; stating that "the prosecution cannot be compelled to ' "present its case in the sanitized fashion suggested by the defense." ' [Citation.]"].)

The second problem with Fletes's argument is that we review the trial court's Evidence Code section 352 ruling based on the information available to the court when the ruling was made. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1009.) When the trial court ruled here, it could not know what Fletes would tell the jury because he had not

yet testified. The in limine motion that the court had before it urged the exclusion of "any and all" gang evidence. The motion asserted that there was "no evidence" that the alleged crimes were gang related. "This is not a gang case. Just because the prosecution has stuck a 'gang' label on it and has a pseudo-expert ready to come in and parrot rhetoric about gangs and their crimes does not mean that the evidence is relevant to the issues in this case." Fletes's counsel maintained that position when he renewed his objections before Zuniga testified. Counsel asserted that Fletes had "turned his life around" and that there was "a clear . . . demarcation point where he's no longer a gang member." On this record, the trial court was well within its discretion when it responded, "I have no idea actually what you're going to do with your case, to be honest with you, and I don't want to know necessarily, but I do understand he's got a burden to meet and I think relevant evidence is admissible. And I don't really think this is cumulative. I think it provides the immersion aspect of the involvement . . . ."

Fletes argues that the amount of pre-2002 gang evidence admitted "far exceeded the quantum of such evidence" that was held unreasonably prejudicial in *Williams* and *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*). Those cases are readily distinguished.

The defendant in *Williams* "challenged the cumulative impact of admitting evidence of dozens of prior crimes," some of which were introduced "multiple times and for multiple purposes." (*Williams*, *supra*, 170 Cal.App.4th at pp. 598, fn. 5, 610.) The Court of Appeal found "plain" but harmless error in the admission of "unnecessary quantities of evidence" that "turned the trial of this routine drug and weapons possession case into a weeks-long marathon." (*Williams,* at p. 595.) The court further concluded that it was an abuse of discretion (but a harmless one) "to admit cumulative evidence concerning issues not reasonably subject to dispute." (*Id*. at p. 611.) The "sheer volume" of the evidence in *Williams* extended the trial and the burden on the judicial system and the jurors "beyond reasonable limits, and the endless discussions among the trial court

and counsel concerning the admissibility of such evidence amounted to a virtual street brawl." (*Ibid.*)

Nothing like that occurred here. The trial court did not admit evidence of "dozens" of prior crimes. (*Williams*, *supra*, 170 Cal.App.4th at pp. 595, 598.) Discussions about admissibility were neither "endless" nor contentious. (*Id*. at p. 611.) Presentation of the evidence did not consume an undue amount of time or extend the trial beyond reasonable limits. Also unlike in *Williams*, the issue of Fletes's involvement in the gang was reasonably subject to dispute when the trial court ruled. Fletes's reliance on *Williams* is misplaced.

Fletes's reliance on *Leon* is similarly misplaced. There was "overwhelming" evidence of the defendant's active gang membership in *Leon*. (*Leon*, *supra*, 161 Cal.App.4th at p. 169.) On that record, the court held that evidence of the defendant's prior juvenile adjudication was " 'merely cumulative regarding an issue that was not reasonably subject to dispute.' " (*Ibid.*) Here, Fletes's counsel stated at the in limine hearing that Fletes's active gang membership was a contested issue. *Leon* is inapposite here.

### b. Evidence of Fletes's Active Gang Membership After 2003

Fletes contends that the trial court abused its discretion by allowing Zuniga to explain how Fletes's involvement in gang activity after he was paroled in 2003 supported his expert opinions. Fletes complains that "much of the testimony" had "no relevance except to further incline the jury to convict [him] based on his association with criminal gang members." We disagree.

Contrary to Fletes's assertions, the evidence was probative of more than his mere "proximity" to active gang members. Evidence of the 2005 traffic accident that killed a Sureño gang member was probative of Fletes's active participation in the gang because the victim was driving a car that was registered to Fletes and he had a loaded handgun in his waistband. Evidence about the white Nissan Altima that was taken after the father of

36

Sureño gang members was murdered in January 2009 was probative of Fletes's gang involvement because the Altima was found outside his shop several days after the shooting. Evidence of Fletes's telephone conversations with jailed Sureños and about the regular deposits he made to their jail accounts was probative of his "more than nominal or passive" support of active Sureño gang members. (§ 186.22, subd. (a).) Like the pre-2002 evidence, the post-2003 evidence had some tendency in reason to prove elements of the prosecution's case and to disprove the defense theory that Fletes was no longer a gang member on January 15, 2009. (Evid. Code, § 210.) Thus, its probative value was high.

On the record before us, the high probative value of the evidence was not substantially outweighed by its potential for prejudice. The post-2003 evidence was not confusing. It did not consume an unreasonable amount of time. It was not cumulative because it described Fletes's gang involvement at a later point in time, after he claimed to have turned his life around.

To the extent Fletes contends that the post-2003 incidents that Zuniga relied on were likely to inflame the jurors' emotions against him, we disagree. Fletes complains for example that Zuniga told the jury that one of the many bases for his opinions was the shooting by unknown males of a Sureño who was waiting for a quote outside Fletes's shop in 2008. He also complains that Zuniga told the jury that he relied on statements by witnesses after the 2008 shooting that they saw persons "they believed to be gang members going to and from the body shop at all hours of the day." This evidence was not beneficial to Fletes's case, but it was not prejudicial as Evidence Code section 352 defines that term. (*Tran*, *supra*, 51 Cal.4th at p. 1048.) There was no suggestion of criminal conduct by Fletes in connection with the 2008 shooting. The jury had already heard about the incident from Plummer, who testified that he was familiar with JR's Auto Body because it was "the site of a homicide, a gang-related homicide, where somebody was murdered outside of the shop." Fletes later testified about the incident. We see nothing about the 2008 shooting or about any of the post-2003 evidence that was likely to

37

inflame the jurors' emotions and motivate them to use the evidence for an illegitimate purpose. (*Scott*, *supra*, 52 Cal.4th at p. 491.) The trial court gave the appropriate limiting instructions. The court also instructed the jury that it could not use the evidence to conclude that Fletes was a person of bad character. The jury acquitted Fletes on the assault charge, which shows that it did not accept the evidence uncritically or use it for an improper purpose. The trial court's decision to allow expert testimony about Fletes's post-2003 gang involvement was not an abuse of discretion.

Fletes maintains that evidence that the body shop "apparently was linked to an unsolved murder was . . . highly prejudicial." This overstates Zuniga's very brief testimony about the white Nissan Altima taken during one of the January 2009 homicides. The jury had already heard about that incident from Hoskins and the other gang task force officers and evidence technicians who testified about it. Zuniga stated that the victim was the father of known Sureño gang members, that the victim's white Altima was found outside Fletes's shop on Dayton Street after the murder, and that that fact played into his opinion about Fletes's involvement in the Sureño gang. Fletes later testified that that he was aware the Altima was parked there because the driver asked him if he could park it there. "I told them, yes, if the car wasn't stolen." "They said it's just something had happened and they just needed somewhere to park it. I said, 'As long as you park it on the street and not in my business facility.'" Fletes disclaimed any knowledge that the Altima had come from the home of a Sureño whose father had been killed. We do not consider Zuniga's testimony about the Altima inflammatory.

Fletes also complains that Zuniga told the jury that the green minivan used in one of the January 2009 homicides "was located at Fletes'[s] shop." This mischaracterizes Zuniga's testimony. Neither Zuniga nor any other witness testified or even suggested that the green minivan was ever found at Fletes's shop. What Zuniga actually said was that there was information that the green minivan "was *supposed to be* at [the body shop]." (Italics added.) This was consistent with Plummer's direct testimony that gang

38

task force officers were briefed on January 15, 2009, that the minivan might be at one of several body shops "getting painted or getting some kind of work done on it to alter its appearance." It was also consistent with Pinon's and Salas's testimony that they went to Fletes's shop to look for the green minivan. Zuniga's testimony about the green minivan was not inflammatory.

### c. Zuniga's Testimony About Villareal

Fletes complains that the trial court abused its discretion in permitting Zuniga to testify about Villareal's active participation in the Sureño gang. Fletes claims that this "inflammatory" and "entirely cumulative" evidence prejudiced him because the prosecution urged that his association with Villareal was probative of his own active gang membership and gang motivation in committing the charged offenses. Fletes's argument lacks merit.

The evidence was relevant as a basis for Zuniga's opinions. It was relevant to the gang enhancement allegations, which required proof that Fletes committed his crimes "for the benefit of, at the direction of, or *in association with* any criminal street gang." (§ 186.22, subd. (b), italics added.) It was particularly probative of Fletes's knowledge that Villareal remained an active gang member. Fletes's testimony implied that he was unaware of the extent of Villareal's gang involvement. He claimed that they never spoke about "gang stuff" or committing crimes or owning guns. He told the jury that he "never paid attention" to the gang tattoos on Villareal's arms and had not seen the gang tattoo on his stomach. He denied knowing that Villareal was from Long Beach, although the "Longos" tattoo on his neck suggested "a possibility" that he might be. Zuniga's testimony about the extent of Villareal's active gang involvement was probative of Fletes's knowledge. It was not cumulative. (*Tran*, *supra*, 51 Cal.4th at p. 1049.) It did not consume an unreasonable amount of time, requiring fewer than 30 of the 6,000 reporter's transcript pages devoted to the presentation of the evidence.

39

Fletes argues that the evidence was unreasonably prejudicial. He does not explain how evidence about *Villareal*'s gang participation would inflame the jurors' emotions against himself. We do not believe that it would. Evidence of Villareal's participation in the jail assault was significantly sanitized, and evidence of his other police contacts was no stronger or more inflammatory than the testimony about the offenses both defendants were charged with. (*Tran*, *supra*, 51 Cal.4th at p. 1047.) The jury had already heard direct testimony about the gang indicia found during the search of Fletes's house. Further, the jury heard from Klein and from Fletes himself that Fletes was trying to show Villareal that "there was another life, instead of the one that he grew up around." The trial court gave appropriate limiting instructions. It was not an abuse of discretion to admit expert testimony about Villareal's active gang membership against both defendants.

### d. Evidence of Predicate Offenses

A section of Fletes's opening brief on appeal complains that the trial court admitted "cumulative and unreasonably prejudicial evidence of predicate offenses" but the precise nature of his argument is unclear. He argued in limine (1) that it "would be wrong" to introduce a predicate involving "any particular defendant . . . or defense attorney" involved in this case and (2) that that it would be "unduly prejudicial and not very probative at all" to admit evidence of his 2001 conviction as a predicate offense since he was going to admit that he "was once a gang member." To the extent he reasserts those arguments here, we reject them.

"[A] predicate offense can be established by proof of an offense committed by the defendant." (*Tran*, *supra*, 51 Cal.4th at p. 1046.) "Further, that the prosecution may have the ability to develop evidence of predicate offenses committed by other gang members does not require exclusion of evidence of a defendant's own separate offense to show a pattern of gang activity." (*Id.* at p. 1044.) The high court's holding in *Tran* disposes of Fletes's first argument.

40

His second argument also lacks merit.  We have already determined that the trial court did not abuse its discretion in admitting evidence of his pre-2002 gang activities over his irrelevance and Evidence Code section 352 objections to support Zuniga's expert opinions on motive and intent.  (*Ante*, pp. 32-36.)  The fact that the evidence served an additional purpose by showing a predicate offense increased its probative value in our view, and did so without increasing its potential for prejudice.  Zuniga's testimony about Fletes's 2001 conviction was brief.  It was less inflammatory than the testimony in this case, where Fletes was charged with pointing his illegally possessed firearm at Pinon.  (*Tran*, *supra*, 51 Cal.4th at p. 1047.)  The jury was instructed that the evidence was admitted only as a basis for Zuniga's opinions and that it could not be used to conclude that Fletes had a bad character or a criminal disposition.  The trial court did not abuse its discretion in admitting the evidence.

### e.  Zuniga's Mention of the Mexican Mafia

In a two-sentence argument at the end of his argument about predicate offenses, Fletes complains that "Zuniga twice told jurors that the Sureños were connected to the 'Mexican Mafia' prison gang."  He argues that this was "virtually immaterial to the prosecution's case" and "highly inflammatory."  Even if we assume that Fletes preserved this argument for appeal, it lacks merit.

Zuniga traced the origins of today's Hispanic street gangs to the Nuestra Familia and Mexican Mafia prison gangs.  He stated that "[t]he supreme Sureño gang, being the Mexican Mafia, is one of the oldest prison gangs."  He went on to describe various Sureño gangs in Salinas, telling the jury that they identify with the color blue and with the number 13, "which stands for the 13th letter of the alphabet showing their allegiance towards the letter 'M' for the Mexican Mafia."  He described the violent rivalry between Sureño and Norteño gangs.  He explained that Norteños identify with the color red and the number 14, "showing their allegiance towards the supreme Norteño gang, which would be the Nuestra Familia . . . the . . . 14th letter of the alphabet being the letter N."

41

We find nothing inflammatory about Zuniga's mention of the Mexican Mafia in this context. His testimony about Sureño gang history, culture, and activities was relevant to the active gang participation charges and to the gang enhancement allegations. His two references to the Mexican Mafia were exceedingly brief. Fletes has not demonstrated that he was prejudiced by them. Nor can he. His acquittal on the most serious count makes it apparent that the jury did not use Zuniga's mention of the Mexican Mafia for an illegitimate purpose.

Fletes's reliance on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) is misplaced. In that case, a "panoply" of incriminating gang evidence that "might have been tangentially relevant to the gang allegations" but had "no bearing on the underlying charges" was presented at trial. (*Id.* at p. 227) Albarran was convicted and the gang allegations were found true. The trial court granted a new trial on the gang allegations, finding insufficient evidence to support them. (*Id.* at p. 217.) On appeal, Albarran argued that the gang evidence was so prejudicial that a new trial should have been granted on all counts. (*Ibid.*) The majority agreed. "Certain gang evidence, namely . . . the threat to police officers, the Mexican Mafia evidence and evidence identifying other gang members and their unrelated crimes, had no legitimate purpose in this trial." (*Albarran*, at p. 230.) The admission of gang evidence with "no connection to [Albarran's] crimes" was so prejudicial "that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt." (*Id.* at pp. 227-228.) Thus, *Albarran* was "one of those rare and unusual occasions where the admission of evidence . . . violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id.* at p. 232.)

This case is not one of those rare and unusual occasions to which the *Albarran* court referred. Unlike in *Albarran*, Zuniga's testimony about gangs was relevant and probative. He briefly mentioned the Mexican Mafia in the context of providing general background information about gang rivalry in Salinas. That testimony was neither

inflammatory nor prejudicial. It did not render Fletes's trial fundamentally unfair. *Albarran* is inapposite here.

### f. Due Process

Fletes contends that the admission of "excessive" gang evidence rendered his trial fundamentally unfair and violated his right to due process. Not so. The evidence was properly admitted. There was no denial of due process. (*Yeoman*, *supra*, 31 Cal.4th at pp. 122-123.)

### C. Confrontation Clause Challenge to Zuniga's Testimony

Defendants contend that Zuniga's opinion about the "primary activities" of the Sureño gang was based on testimonial "hearsay basis evidence" admitted in violation of their Sixth Amendment right to confrontation. (§ 186.22, subd (f).) Specifically, they challenge Zuniga's testimony about the predicate offenses. As we understand their argument, (1) under the "holding" of *Williams v. Illinois* (2012) __ U.S. __ [132 S.Ct. 2221] (*Williams*), Zuniga's testimony about the predicate offenses was based on hearsay necessarily admitted for its truth, in violation of the confrontation clause; (2) Zuniga's testimony about the convictions of Rivas and Carrillo was "by necessity, the result of police interrogation" and therefore testimonial hearsay admitted in violation of the confrontation clause; and (3) without competent evidence of the Rivas and Carrillo convictions, it cannot be said that the jury would have found that the gang " 'consistently and repeatedly' committed crimes and acts listed in section 186.22, subdivision (e) as their 'primary activity.' " Defendants urge that these errors require reversal of their gang crime convictions and the gang enhancements. We disagree.

### 1. *Williams*

The starting point of defendants' argument is their entirely erroneous assertion that "[t]he United States Supreme Court recently held that hearsay basis evidence, relied on by an expert at trial, is introduced for the truth of the matter asserted and, thus, is subject

to the Sixth Amendment Confrontation Clause." Defendants cite *Williams* for this proposition.

In *Williams*, the United States Supreme Court considered whether an expert's testimony that a DNA profile produced by an outside laboratory matched a profile produced by the state police lab using a sample of the defendant's blood violated the confrontation clause. (*Williams*, *supra*, 132 S.Ct. at p. 2227.) In a 4-1-4 opinion, the plurality held that there was no confrontation clause violation. (*Id.* at p. 2228 [plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.].) The court gave two reasons for its decision. The first was that the "basis evidence" was not offered for its truth. (*Id.* at pp. 2228, 2239.) "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id.* at p. 2228.) Five justices disagreed with the plurality on this point, concluding that the basis evidence was offered for its truth. (*Williams*, *supra*, 132 S.Ct. at pp. 2257 [conc. opn. of Thomas, J.], 2268 [dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.].)

A second and "independent" reason for the plurality's decision was that even if the basis evidence was offered for its truth, it was not testimonial. (*Williams*, *supra*, 132 S.Ct. at p. 2228 [plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.] The DNA report was "produced before any suspect was identified," it was sought "for the purpose of finding a rapist who was on the loose" rather than to obtain evidence against the defendant (who was not a suspect at the time), and it was "not inherently inculpatory." (*Ibid.*) Justice Thomas agreed with the plurality on this point, concluding that the basis evidence was not testimonial because it "lack[ed] the solemnity of an affidavit or deposition" and "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Id.* at p. 2260 [conc. opn. of Thomas, J.].)

Defendants mischaracterize *Williams.* The common view expressed by Justice Thomas and the four dissenting justices (that hearsay basis evidence is necessarily offered for its truth) cannot properly be characterized as the "holding" of the case. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who *concurred* in the judgments on the narrowest grounds. . . .' [Citation.]" (*Marks v. United States* (1977) 430 U.S. 188, 193, italics added.) The four dissenting justices in *Williams* plainly did not concur in any judgment. (*Ibid.*) "[D]issenting opinions are not binding precedent. [Citations.]" (*People v. Lopez* (2012) 55 Cal.4th 569, 585.) Contrary to defendants' assertion, *Williams* does not hold that hearsay basis evidence is necessarily offered for the truth of the matter and therefore subject to the confrontation clause. It remains the rule, as reaffirmed in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), "that the [confrontation clause] 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" (*Williams*, *supra*, 132 S.Ct. at p. 2224 [plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.], quoting *Crawford*, at p. 59, fn. 9.)

It has long been and remains the rule in California that an expert may testify "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801; *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620 (*Gardeley*).) "The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*Gardeley*, at p. 617.) "So long as the threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony." (*Id.* at p. 618.) Evidence Code section 802 permits an expert witness to "state on direct examination the reasons for his opinion and

the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based . . . ." (Evid. Code, § 802.) An expert's recitation of out-of-court statements for the nonhearsay purpose of showing the basis for the expert's opinion "does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*Gardeley*, at p. 619.) "Consistent with these well-settled principles," the *Gardeley* court held that a police detective "could testify as an expert witness and could reveal the information on which he had relied in forming his expert opinion, including hearsay." (*Ibid*.) We are bound by that holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Here as in *Gardeley*, Zuniga could testify as an expert and could properly reveal the information on which he relied in forming his opinions, including hearsay.[5] (*Gardeley*, at p. 619.)

## 2. "Primary Activities" and Predicate Offenses

Even if we were to accept defendants' assertion that hearsay basis evidence is necessarily offered for its truth and absent cross-examination violates the confrontation clause, we would find no violation here because they have not established that the challenged predicate offense and primary activities evidence they was hearsay or, if it was, that it was testimonial hearsay.

Establishment of the substantive gang offense requires proof of the defendant's active participation in a "criminal street gang." (§ 186.22, subd. (a); *Rodriguez*, *supra*, 55 Cal.4th at p. 1130.) The gang enhancement similarly requires proof of the defendant's conviction of a felony "committed for the benefit of . . . any criminal street gang." (§ 186.22, subd. (b); *Gardeley*, *supra*, 14 Cal.4th at pp. 609-610.) A "criminal street gang" is a group of three or more persons that has as "one of its primary activities the commission of one or more of the criminal acts enumerated" in the statute. (§ 186.22,

---

[5] The California Supreme Court is currently considering whether a defendant's Sixth Amendment right to confrontation was violated by a gang expert's reliance on testimonial hearsay. (*People v. Sanchez,* review granted May 14, 2014, S216681.)

subd. (f).)  It must also have a common name or common identifying sign or symbol and its members must "engage in or have engaged in a pattern of criminal gang activity." (*Ibid*.)  "A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.'" (*People v. Loeun* (1997) 17 Cal.4th 1, 4; § 186.22, subd. (e).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations.  [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)  "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id*. at p. 324.)  The trier of fact may consider past offenses and the charged offenses in determining whether the primary activity element is satisfied.  (*Sengpadychith*, at pp. 320, 323.)  "Also sufficient might be expert testimony, as occurred in *Gardeley*, *supra*, 14 Cal.4th 605.  There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies.  [Citation.]  The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies.  [Citation.]" (*Sengpadychith*, at p. 324.)

Here, Zuniga testified that "a lot" of the gang crimes in Salinas are very violent crimes involving firearms, which gang members obtain by burglarizing homes where they know firearms are present.  These violent crimes range from shootings to carjackings to murders.  The primary activities thus involved a number of statutorily enumerated offenses.  (E.g., § 186.22, subd. (e)(1) [assault with a deadly weapon or by

47

means of force likely to produce great bodily injury], (3) [unlawful homicide or manslaughter], (5) [shooting at an inhabited dwelling or occupied motor vehicle], (21) [carjacking], (31) [prohibited possession of a firearm].) The prosecution introduced certified court records establishing seven predicate offenses. Those offenses included murder, shooting at an occupied vehicle, assault on a peace officer, assault with a deadly weapon, and the prohibited possession of firearms. Zuniga's testimony, together with the certified court records that were admitted into evidence without any hearsay or confrontation clause objections, were sufficient to establish that the primary activities of the Sureño gang in Salinas were violent firearms-related crimes ranging from shootings to carjackings to murder. (*Gardeley*, *supra*, 14 Cal.4th at pp. 613, 620)

Defendants claim that Zuniga's testimony about the gang's primary activities was inadmissible hearsay. The record does not entirely support that assertion. Zuniga described his experience as a gang task force officer. He testified that he had "seen" violent crimes such as murder, attempted murder, and carjackings committed by Sureños not only against Norteños but also against innocent civilians. He had "absolutely" seen Sureños commit those crimes against police officers. Thus, his opinion about the gang's primary activities appears to have been based to a large extent on his personal knowledge. In fact, he testified that his opinions about the predicate offenses were "based off my knowledge and experience working with Sureño gang members and Norteño gang members in the streets of Salinas as well as the prior predicates that I just went over with you." To the extent he described the predicate offenses, his testimony seems to have been based on the certified court documents that the prosecution offered into evidence to establish those predicate offenses. Such documentation is not hearsay. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1453, 1460-1461 (*Duran*).)

Defendants acknowledge two predicate offenses that were supported by certified court documents. They assert, however, that Zuniga's testimony about other predicate offenses, specifically those of Rivas and Carrillo, was not supported by certified

48

documents. Defendants summarily assert that Zuniga's testimony about those two convictions "was, by necessity, the result of police interrogation" and thus testimonial. Their overall argument appears to be that without these two predicates, there was insufficient evidence to establish the gang's primary activities. The argument lacks merit.

Zuniga testified that he was "very familiar" with the case against Rivas and Carrillo because he was the gang expert in that case. He was shown People's exhibit 275, and he testified that it accurately reflected Rivas's and Carrillo's murder convictions with multiple gun and gang enhancements. People's exhibit 275 is a 19-page document that includes certified copies of the amended information against Rivas and Carrillo, certified copies of the court minutes reflecting the jury's verdicts and the trial court's imposition of sentence, and abstracts of the judgments against them. These certified court records establish the convictions of Rivas and Carrillo. (*Duran*, *supra*, 97 Cal.App.4th at pp. 1448, 1453, 1460-1461.) Such records do not constitute "'testimonial'" evidence, and Zuniga's reliance on them did not give rise to a confrontation clause violation. (*People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [records "prepared to document acts and events relating to convictions and imprisonments" are beyond the scope of *Crawford*.]; see *Crawford*, *supra*, 541 U.S. at p. 56.) The prosecution submitted certified court documents establishing seven predicate offenses. Those predicates and Zuniga's testimony were more than sufficient to establish that a primary activity of the gang was the commission of certain statutorily enumerated offenses. Defendant's confrontation clause challenge to the primary activities and predicate offense evidence lacks merit.

## D. Alleged Instructional Error

Defendants contend that their substantive gang crime convictions must be reversed because the trial court misinstructed the jury with former CALCRIM No. 1400. That instruction provided in pertinent part that "[t]he defendants are charged in Count 5 with

49

participating in a criminal street gang, in violation of Penal Code Section 186.22(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant actively participated in a criminal street gang; two, when the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and three, the defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by, A, directly and actively committing a felony offense; or B, aiding and abetting the felony offense." Defendants argue that this instruction misstated the law on an element of the offense by permitting the jury to convict them of violating section 186.22, subdivision (a) even if each acted alone. We need not reach this question because even if we assume that former CALCRIM No. 1400 misstated the elements of the substantive gang offense, any error here was harmless.[6]

Generally speaking, "an instructional error that improperly describes or omits an element of an offense . . . is not a structural defect in the trial mechanism" that requires automatic reversal. (*People v. Flood* (1998) 18 Cal.4th 470, 502-503.) Rather, misinstruction on the elements of an offense is subject to a harmless error analysis under the *Chapman* standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Neder v. United States* (1999) 527 U.S. 1, 9; *People v. Cox* (2000) 23 Cal.4th 665, 677, fn. 6.) "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] . . . Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal* (2003) 31 Cal.4th 63, 86.) "An instructional error presenting the jury

---

[6] We note that former CALCRIM No. 1400 has been amended to add language stating that "[a]t least two gang members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." (CALCRIM No. 1400.)

50

with a legally invalid theory of guilt does not require reversal . . . if other parts of the verdict demonstrate that the jury necessarily found the defendant guilty on a proper theory." (*People v. Pulido* (1997) 15 Cal.4th 713, 727 (*Pulido*).)

Here, other parts of the verdict demonstrate that the jury necessarily found defendants guilty on a proper theory. (*Pulido*, *supra*, 15 Cal.4th at p. 727.) The jury found the gang enhancement allegations against both defendants true. It could only have done so by finding that each acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) Since Villareal and Fletes were the only gang members present at the time, the jury necessarily found that each acted with the specific intent to promote, further, or assist in the other's criminal conduct. Thus, it necessarily found that each aided and abetted the other in committing his firearm possession offense. On this record, the claimed instructional error was harmless beyond a reasonable doubt.


### E. Alleged Prosecutorial Misconduct

Defendants contend that the prosecutor's "pervasive" misconduct denied them due process. We disagree.

" ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " ' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 215-216.) "A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the

evidence. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726 (*Ledesma*).) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203 (*Cole*).) "As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858.) "Simply to object or make an assignment of misconduct without seeking a curative admonition is generally not enough. [Citation.] 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ' [Citation.]" (*People v. Bonin* (1988) 46 Cal.3d 659, 689 (*Bonin*), overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn.13.) Forfeiture does not result, however, if a timely objection or request for admonition would have been futile, but this exception is applied only in "unusual circumstances." (*Hill*, at p. 821.)

### 1. Villareal's Contentions

### a. Reference to Prior Misdemeanor Conviction

Villareal asserts various instances of prosecutorial misconduct, the first of which occurred during the prosecutor's cross-examination of Sandra Fletes.

There were pretrial discussions about Villareal's prior misdemeanor conviction for engaging in lewd or dissolute conduct in a public place (§ 647, subd. (a)). The trial court ruled that evidence of statements Villareal made about his gang membership after he was

arrested could be elicited, but references to "the [indecent] exposure aspect" of the offense were inadmissible.

Villareal's trial counsel raised the subject again before Zuniga took the stand. During a discussion about predicate offenses, counsel reminded the court that there was a "conviction of [Villareal] for a 647(a), which started out as a 314.1. The Court had indicated . . . that this might come in under an 1101 or in the gang expert's testimony, and . . . [that] it would sanitize that; that, in fact, the only thing from that particular conviction or arrest was that [Villareal] said he was a Sureno." The court responded that "we went through all those at the beginning." The prosecutor stated that "[t]he People are not getting into that."

The subject did not come up again until the prosecutor was cross-examining defense witness Sandra Fletes about Fletes's gang contacts. He asked whether she knew that Villareal was a Sureño, and she responded that she never asked him about his past. The prosecutor then elicited testimony that Villareal was like a family member, that he had a room in the family home and stayed with the family "on occasion," and that Sandra Fletes "let him hang out" with her children. The prosecutor then asked, "And that's based on your knowing him at that time and that he -- you thought he was of upstanding -- of upstanding character; correct?" A unspecified defense objection to that question was sustained. The following exchange then occurred. "Q: Why did you let him hang out with your children? [¶] A: I didn't see him as a threat. And he got along well with them and my children got along well with him. [¶] Q: Would it change your mind if you knew that he was convicted of a crime associated with his masturbating in front of a neighbor --" Both defense counsel objected. The prosecutor asserted, "It goes to character evidence."

The defense moved for a mistrial. At a sidebar conference, the trial court characterized the question as coming "just out of nowhere" and without prior clearance from the court. "[Y]ou did not approach this in a typical cross-examination of a character

53

witness. This witness was hardly that. This witness was very vaguely presented as something to do with character. In asking a character witness questions on cross-examination, one fundamental aspect of that is 352. I can't go through a balancing process when you blurt out the question." After extended discussions off the record, the trial court announced its ruling. "So, I am going to admonish the jury to disregard that question . . . . [¶] The Court finds that it is appropriate in this case, and with this particular witness, to limit in every way any further cross-examination related to impeaching or cross-examining her as a character witness. You aren't going to ask her anymore [*sic*] questions, have you heard, like that. That is this Court's ruling." At the start of the afternoon session, the trial court gave the following admonishment: "So, last time we saw each other there was an objection we had at sidebar. We've discussed it since then. The Court's ruling is that you are to disregard the last question. Do not consider it for any purpose whatsoever."

Villareal contends that the prosecutor committed misconduct and that the trial court's admonition was inadequate. The Attorney General agrees that the question was improper "given the court's ruling and the lack of relevance to the *direct* examination or any evidence that Villareal elicited." She argues, however, that the court was well within its discretion in concluding that an admonition was sufficient to cure the harm. We agree with the Attorney General.

"A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]." (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*).) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*Ibid.*) "[W]e review a trial court's ruling on a motion for mistrial for abuse of discretion." (*Ibid.*)

54

There was no abuse of discretion here.  The offending reference came in the form of a single question that went unanswered.  In the context of a trial that lasted more than a month, the reference was fleeting.  The jury was instructed that "nothing" the attorneys said was evidence, that the attorneys' questions were not evidence, and that they should not assume that something was true "just because one of the attorneys asked a question that suggest[ed] it [was] true."  "We presume that jurors are intelligent and capable of understanding and applying the court's instructions.  [Citation.]"  (*People v. Butler* (2009) 46 Cal.4th 847, 873.)  That the jury did so here is established by the fact that they acquitted both defendants on the most serious charges.

### b.  Alleged Misconduct During Closing Argument

### (1) Alleged References to Facts Not in Evidence

Villareal contends that the prosecutor committed misconduct by arguing facts not in evidence.

The prosecutor stated, "Let's look at the direct evidence that was presented to you . . . .  [¶]  January 2009, a month of gang violence.  And I'm going to go through this, ladies and gentlemen.  It's basically going to be rehashing the case . . . .  [¶]  Basically, a month of gang violence.  You had . . . six murders during that month, none of which occurred after January 15th, the day the two defendants were arrested and taken into custody.  [¶] . . . [¶]  January 15th, Salinas Police Department and the Monterey County Joint Gang Task Force come together.  We got to do something.  We got to share intelligence about what's going on here . . . .  [¶]  And so, that's the reason why these two gentlemen, the two officers who came up here and testified, told you they went out there . . . .  Just to do intel on the shop, to see if these two cars associated with two of the murders . . . were there at the shop."

Villareal claims the prosecutor committed misconduct "when he stated that no murders occurred 'after January 15th, the day the two defendants were arrested and taken into custody.'"  He claims that there was no evidence that the murders ceased after that

date and that the comment was "improperly designed to get the jury to speculate that [he and Fletes] were responsible for the six murders . . . ."

Villareal forfeited this claim by failing to raise it below. (*People v. Panah* (2005) 35 Cal.4th 395, 462 (*Panah*).) It lacks merit in any event.

The prosecutor's statement was consistent with the evidence. Hoskins testified that there were "sixteen shootings in the month of January and five or six homicides, I believe it was six, in the month of January." Plummer testified that five of the January homicides occurred between January 9 and January 12, 2009. Cline testified that there were "nearly a dozen shootings, five of those resulting in homicides," in the first two weeks of January 2009. Thus, none of the "five or six" referenced murders occurred after January 15, 2009.

It is not reasonably likely that the jury construed or applied the complained-of remark in the objectionable fashion that Villareal suggests. (*Cole*, *supra*, 33 Cal.4th at pp. 1202-1203.) The jury heard the officers' testimony. The gang task force met on January 15, 2009. Pinon and Salas surveilled Fletes's shop on that date. Fletes was shot and defendants were arrested on that date. Viewed in context, the complained-of remark merely highlighted the central date in the case. It was not misconduct.

Villareal next complains that there was no evidentiary support for the prosecutor's comments that the prosecutor had been "mortared" and that anesthesia is "like truth serum." He forfeited any objection to the "mortared" comment by failing to object to it below. (*Panah*, *supra*, 35 Cal.4th at p. 462.) We think he forfeited any objection to the "truth serum" comment as well, although his unspecified objection to the statement ("I object to that") was sustained. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 560 [objections "on the vague ground of 'improper argument'" did not preserve arguments for appeal] (*Fernandez*).)

In any event, neither complained-of statement was misconduct. When prosecutorial misconduct is alleged, "we must view the statements in the context of the

argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) The remarks that Villareal challenges here were made during the prosecution's argument that Fletes knew why he was shot, as evidenced by the absence of any testimony besides his own that he ever asked anyone why he had been shot. The prosecutor referred to Detective Bret Spiers's account of his interaction with Fletes at the hospital. Spiers testified that he was with Fletes in the intensive care unit (ICU) of the hospital and that he walked behind the gurney when Fletes was moved out of the ICU to another area of the hospital. He testified that Fletes was awake, slightly propped up on the gurney, and speaking to his wife and his sister in Spanish as orderlies wheeled him head-first down the hallway. When Fletes noticed Spiers at the foot of the gurney, "he looked at me, he raised his right hand just like this, and said, 'The officer was a good shot.'" The defense tried to establish that Fletes was "too drugged" to know what he was saying.

In closing argument, the prosecutor stated, "The officers, the hospital records, the radio transmissions all prove that . . . he was fine in regards to his mental capacity. He was shot, don't get me wrong. He was shot. And I don't know what it's been like being shot. *I've been mortared at, but I've never been shot*. I don't know what he's going through. [¶] But the fact is, as you look at all of the surrounding circumstances, and it's clear that he knew what was going on. He knew why he was shot. And not once did he ask, Why am I shot? There's no evidence of that, besides his incredible testimony. Deputy Pinon told you, he didn't ask me. Deputy Hoskins told you, he didn't ask me. Officer Salas told you, he didn't ask. Chris Plummer told you, he didn't ask. . . . [¶] He didn't ask why he was shot because he knew why he was shot. He . . . knows . . . what happens when you point a gun at a police officer, and that's why he didn't ask. He could have asked, he had the mental capacity to ask, but he didn't because he knew the answer." (Italics added.) The prosecutor later stated, "What would be the reaction of a person [who had just been shot]? You know what it would be. First of all, you would be surprised. You would be shocked. You would ask what the heck just happened. You

57

would ask, Why was I shot? And then, when you were in the hospital . . . , you wouldn't see an officer and the first thing you say to him was 'Officer was a nice shot.' No. It's not the reaction of someone who is painting in the warehouse and just gets shot. . . . [¶] Now, I know he was under anesthesia. I've been under anesthesia, *and to me it's like truth serum*. You say what's on your mind. It comes out." (Italics added.)

Villareal complains that the prosecutor "put unsworn testimony on a critical point before the jury" and that the claimed misconduct "had the prejudicial effect of discrediting the defense and corroborating the prosecution." Not so. The statements plainly had no prejudicial effect, because the jury acquitted both defendants on the section 245, subdivision (d) counts.

### (2) Alleged Invitation That Jurors View Evidence Through Their Own Eyes

Villareal contends that three times during closing argument, the prosecutor improperly invited the jury to view the evidence through their own eyes. The first instance occurred when the prosecutor was describing the moment at which the investigation changed from "just doing a straight intel" to "investigating a Sureño, a felon with a gun." The prosecutor argued, "That's their job. Their job as Monterey County Joint Gang Task Force members [is] to investigate gang members, [is] to investigate gang members with guns. Who's going to do that? . . . Would you do that? . . . No. They do that. That is their job, and that is what they do."

The second instance occurred when the prosecutor was marshalling the evidence that in his view established defendants' active gang membership. He stated, "The guns and ammo at work, the guns and ammo at home. That's the life of a Sureño gang member. Who here has ammunition in their kitchen cabinet? Who here has guns lying throughout the house? Who here has guns at their work? . . . [¶] . . . [¶] . . . Sureño gang members. The two Sureño gang members that are in this courtroom do. And they did on January [15], 2009. Just another piece of the puzzle showing they're Sureños."

58

The third instance of claimed misconduct occurred when the prosecutor asked, "What would be the reaction of a person [who had just been shot]?  You know what it would be.  First of all, you would be surprised.  You would be shocked.  You would ask what the heck just happened . . . ."

Villareal contends that these statements were improper appeals to the jurors' passions and prejudices.  We disagree.

A prosecutor "enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom."  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95.)  There is nothing improper about a prosecutor's use of rhetorical questions based on the evidence.  In *People v. Hughes* (2002) 27 Cal.4th 287, it was fair comment on the evidence when the prosecutor stated during closing argument, " 'Why do you bring a knife if you don't intend to use it, if you're not willing to kill somebody with that knife that you bring with you to somebody else's home when you go to rob them or burgle their apartment?' "  (*Id.* at pp. 374-375.)  In *People v. Frye* (1998) 18 Cal.4th 894 (*Frye*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*), "the prosecutor's use of rhetorical questions, for example, why 'would [the prosecution's chief witness] be making this stuff up?,' was not impermissible" because "there is no impropriety in attempting to persuade jurors to draw inferences based on the evidence."  (*Frye*, at p. 972.)

Here as in *Hughes* and *Frye*, the prosecutor used rhetorical questions to illustrate reasonable inferences that could be drawn from the evidence.  His questions were fairly grounded in the evidence.  There was nothing inflammatory about them.  His argument was not "directed to passion or prejudice rather than to reason and to an understanding of the law."  *Cunningham v. Zant* (11th Cir. 1991) 928 F.2d 1006, 1020 (*Cunningham*).)  This distinguishes the prosecutor's argument here from the cases on which Villareal relies.

In *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, the prosecutor asked whether jurors would trade places with the plaintiff accident victim for $500,000. (*Id.* at p. 484.) "'Someone comes up to you with a handful of diamonds and says, "This is worth $500,000.00." Would you take it and would being crippled for the rest of your life be worth it?'" (*Ibid.*) In *People v. Vance* (2010) 188 Cal.App.4th 1182, the prosecutor told the jury (over objections that the trial court repeatedly sustained) that "[i]n order for you as jurors to do your job, you have to walk in [the murder victim's] shoes. You have to literally relive in your mind's eye and in your feelings what [he] experienced the night he was murdered." (*Id.* at p. 1194.) "'There's nothing more terrifying than a feeling of not being able to breathe. You're totally trapped. [¶] . . . [¶] You don't know what's going on. How long are you conscious in this situation? When do you know to fight? When do you get to fight? What are you thinking to yourself at that time, what did I do, why me. This hurts." (*Ibid.*) Nothing like that occurred here. Nor do the challenged statements here bear any resemblance to the "outrageous" statements that the prosecutor made in *Cunningham* or to the blatant appeal to the jurors' self-interest that the prosecutor made in *People v. Pitts* (1990) 223 Cal.App.3d 606 (*Pitts*). (*Cunningham*, *supra*, 928 F.2d at pp. 1019-1020; *Pitts*, at pp. 694-696.) Villareal's reliance on those cases is misplaced. The statements that he challenges were not misconduct.

### (3) Alleged Disparagement of Defense Counsel

Villareal contends that the prosecutor committed misconduct by asking the jurors to consider what defense expert Wong's testimony would have been had he been paid by the prosecution instead of by the defense. We reject the argument. "[A]n attorney is free to argue that the opinions of paid expert witnesses may be biased." (*People v. Cook* (2006) 39 Cal.4th 566, 613 (*Cook*).)

Such arguments do not disparage defense counsel. (*Cook*, *supra*, 39 Cal.4th at p. 613.) In *Cook*, the California Supreme Court rejected a claim by the defense that the prosecutor's statement that an expert had been paid to "'come[] up with something'" that

60

excused the defendant's responsibility implied that the expert "'gave false testimony for a fee,' thereby impugning defense counsel's integrity for having, in effect, bought the expert's testimony." (*Id.* at pp. 613-614; see also *People v. Spector* (2011) 194 Cal.App.4th 1335, 1407 [no misconduct where prosecutor referred to "'paid-to-say witnesses'"]; *People v. Monterroso* (2004) 34 Cal.4th 743, 783-784 ( *Monterroso* ) [no misconduct where prosecutor referred to the "industry of these defense experts that bounce around from trial to trial, state to state, collecting good money for testimony"].) The prosecutor's comments here were within the bounds of proper argument.

Villareal also challenges the prosecutor's argument about the computer animation that illustrated Wong's testimony. The prosecutor stated, "They got an inaccurate cartoon. . . . That's what it comes down to. They paid $30,000 for a cartoon. [¶] The People, we can't afford to pay $30,000 for a cartoon. We can't afford to pay $30,000, that much money, for something that gives you 'possibly,' 'it could be,' 'maybe,' 'might be.' It's got to be exact, if that's what we're paying for. And trust me, if I had . . . a cartoon made like this, for this case, I wouldn't be working here anymore . . . . [¶] . . . [¶] We cannot pay for 'would be,' 'possibly,' and 'could be.' We don't need to do it in this case. You have the credible testimony of the officers. They want science. They didn't get it. They got 'possibly,' they got 'could be,' and they got 'might be.' What I presented to you was credible testimony, by the officers, which proved this case beyond all doubt."

Villareal claims that the prosecutor's argument undermined the defense "by casting aspersions on the character and integrity of defense counsel." His nonspecific objection ("I object to that") has forfeited this argument on appeal. (*Fernandez*, *supra*, 216 Cal.App.4th at p. 560.)

Even if we assume that he preserved the argument, there is no reasonable likelihood that the jury construed or applied any of the complained-of remarks in the way Villareal suggests. (*Cole*, *supra*, 33 Cal.4th at pp. 1202-1203.) We "'"do not lightly

infer" that the jury drew the most damaging rather than the least damaging meaning to the prosecutor's statements.' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 772 (*Dykes*).) When the statements are viewed in context, it is clear that the prosecutor was arguing that the payments to Wong and Fries influenced their testimony. "[A] prosecutor 'is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie."' [Citations.]" (*People v. Parson* (2008) 44 Cal.4th 332, 360.) The prosecutor had earlier argued that the experts Wong and Fries "are biased because they're paid" and that "[m]oney plays a role in this. You have to look at that in your determination on the credibility of these experts." In any event, Villareal cannot show prejudice. The challenged remarks related only to the assault counts, and the jury acquitted defendants on those counts.

Villareal next complains that the prosecutor committed misconduct by "insinuat[ing] that he wanted the jury to hear everything [while] the defense was trying to hide behind [the] rules of evidence" and "objecting all the time." Assuming that his nonspecific objection preserved the issue for appeal, we disagree.

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 846 (*Bemore*).) However, a "prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics . . . ." (*Ibid.*; see *Frye*, *supra*, 18 Cal.4th at p. 978 [no misconduct where prosecutor accused counsel of making an "irresponsible" third party culpability claim].)

The complained-of argument here attacked the defense strategy. The prosecutor discussed the DNA evidence, noting that prosecution expert "Josh Sehhat told you, the

results are inconclusive." The prosecutor then argued, "Now, the underlying facts that are proven. . . . Direct evidence presented through the credible testimony of the officers . . . . That was enough to prove the guilt of the defendant beyond all doubt. But we have more. We have all of those corroborating facts that I just presented as well. That's why I put on all of that evidence, to show you everything that happened. I'm not hiding anything. I'm not objecting all the time . . . . [¶] . . . [¶] . . . I put on the evidence. . . . I wanted you to hear everything, because it's up to you to look at all of that evidence when you're making that determination, not just one thing. . . . You must look at all the facts of the case. . . . [¶] What does the Defense want you to look at? They want you to focus on an instant of the case. They want you to focus on one second of this case, and that's when Deputy Pinon shot that gun. That's what they want you to focus on. Nothing else." The prosecutor's argument was fair comment on the evidence and on the defense strategy, specifically, Wong's testimony that Pinon's account of the shooting was "just physically impossible."

### (4) Alleged Misstatement of the Law and Shifting of the Burden of Proof

Villareal complains that the prosecutor misstated the law and improperly shifted the burden of proof when he allegedly argued "that the defense was required to produce evidence that the firearms were planted in order for the jury to find reasonable doubt." The prosecutor made no such argument. The argument that he did make was fair comment on the evidence.

### (a) Background

A consistent if not expressly articulated theory of the defense was that the police planted the two guns that were found in the shop. In discussions outside the jury's presence, the trial court referred to it as "this flavor that has been -- it is inserted into this trial. There is no question about it, that's the flavor." Fletes ultimately testified that he believed the officers planted both guns. He conceded that he had no evidence to support that claim.

63

It was against this background that the prosecutor argued in closing that the jury had two factual determinations to make. "Was Mr. Fletes painting? Was he painting when Deputy Pinon entered into that warehouse? Did he have a large, loud, silver paint sprayer, or did he have a small black revolver? . . . In order to reach your verdict, you've got to make this first determination. [¶] Second determination is did the police plant those guns? Where did those guns come from? Did the defendants, as felons and Sureños, possess those guns, or did the police plant those guns? That's the other determination you must make in reaching your verdict." The prosecutor reiterated the point in summing up his argument. "Make two determinations. What did he have in his hand? Small black gun? Silver large paint sprayer? [¶] Did they possess those guns or did the officers plant those guns?" "[T]hat second determination. Did the officers plant those guns? . . . Of course not. There's absolutely no evidence . . . . [¶] The Defense wants to imply it. . . . I challenge them to get up here and state it, but they're not. Instead, they're going to dance around it. They're going to dance around it and point to all this other evidence, which leads you to the question of where did the guns come from? Where did the guns come from? [¶] You heard Defendant Fletes. He told you, I think, yes, the officers planted the guns. And what was the response from the Defense Attorneys? Objection. Objection." "They don't want you to make that decision, but that's the determination you have to make. . . . That's what it's about. . . . Not only about this evidence, not only about . . . what was in Defendant Fletes's hand, but where did those guns come from? The evidence shows where those guns come from. The two defendants. There's absolutely nothing to show that it was planted by anybody else. [¶] You cannot separate the guns from this case. If you believe Fletes and his experts, then you must then answer that question. That's what it comes down to. If you believe Defendant Fletes and you believe his experts, then the next question that's out there is then where did those guns come from? And you have to answer that."

64

At this point, Villareal's counsel interposed a "burden shifting" objection, which was overruled. The prosecutor continued, "You cannot separate the guns from this case. Like I told you, the answer to that question, based on all the credible evidence, is that the defendants possessed those guns and they used those guns in the manner that you heard about. Like I said, Defense won't say this to you. Defense wants to imply this to you. Defense will not say it because there's no evidence of it. I told you in my opening statement there will not be any evidence of that, and there was not any evidence of that. They want you to think it though. But look at all of the evidence, and that's what you must do. [¶] Now, Attorney Hernandez [Fletes's trial counsel] asked questions to, I think one of the officers, Well, do you know officers carry backup guns? Of course, the answer was no. Yet, why would he ask that? Because he want[ed] to plant these seeds--" "Attorney Murphy [Villareal's trial counsel] . . . in his opening statement, he wants you to believe that this was just a mistake. It was a mistake by the officers. What he's actually saying it it's malevolence by the officers. . . . [¶] He wants you to stop at the mistake. No, you can't. If you're going to believe that it was just a mistake, you must take the next step of where did those guns come from. He wants you to believe that it was malevolence, not just a mistake. He won't say that, he will not say that; but trust me, when he says it was just a mistake, where did those guns come from? You look at them and you look at them and you think, where did those guns come from? Because if it's just a mistake, it's malevolence. That's what he's saying. Malevolence by these police officers. That's what he wants you to believe." "Do not allow them to imply anything without evidence. . . . Make sure that . . . if there are implications, that there better be evidence of it. [¶] The only explanation . . . in this case as to where those guns came from, it's clear. Based on all the evidence that we've seen . . . , it's clear. [T]he guns came from the defendants."

## (b) Analysis

"'[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper.'" (*Panah*, *supra*, 35 Cal.4th at p. 463.) "[A] prosecutor may comment that a defendant has not produced any evidence." (*People v. Young* (2005) 34 Cal.4th 1149, 1195 (*Young*).) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340 (*Bradford*).)

In *Young*, the defendant argued that the prosecutor improperly attempted to shift the burden of proof when he argued, "'What fact—what fact other than conjecture and insinuation do you have to say there is a reasonable interpretation of that evidence that leads to the defendant's innocence? What? None. You don't have any. There is none. [¶] Think of what set of circumstances that are reasonable that will hold water, that will hold together, that would say to you as a jury the defendant did not kill Sylvester Davis. There is no evidence. The only evidence you have is that the defendant went into that place alone and left alone.'" (*Young*, *supra*, 34 Cal.4th at p. 1195.) The California Supreme Court concluded that no misconduct occurred because there was "no reasonable likelihood the jurors would have understood the prosecutor's argument as imposing any burden on the defense." (*Id*. at pp. 1195-1196.)

In *People v. Osband* (1996) 13 Cal.4th 622 (*Osband*), the defendant argued that the prosecutor improperly attempted to shift the burden of proof to the defense when he asked the jury to consider what other explanation could account for evidence that was found at the murder victim's apartment. The evidence included the defendant's shoe print impressions. The high court held that the argument was not misconduct. "The prosecutor was suggesting that the most logical interpretation of the evidence was that

66

defendant committed the crimes. It was 'a fair comment on the state of the evidence . . . .'" (*Id.* at p. 696.) Nor was it misconduct when the prosecutor argued that if the defendant "'denies these things [i.e., having committed most of the crimes at the [victim's] apartment], and if you conclude . . . that he is not telling you the truth, I think it's a fair inference to conclude the opposite must be true.'" (*Id*. at pp. 696-697.) The court "underst[ood] the prosecutor to have meant that if the jury did not believe [the] defendant's statement that he did not commit the crimes, it would have to decide that he did commit them. There is no reasonable likelihood that the jury would understand the declaration to affect the burden of proof." (*Id*. at p. 697.)

In *People v. Samayoa* (1997) 15 Cal.4th 795 (*Samayoa*), the defendant argued that the prosecutor improperly attempted to shift the burden of proof when he attacked the defense experts' finding that he suffered from brain damage. The prosecutor argued, "'Now, has the defense been able to create a reasonable doubt in your mind based on what these doctors have told you? I guess that would be the ultimate decision in this case, have they been able to create a reasonable doubt for you?'" (*Id.* at p. 842.) The high court held that the defendant's trial counsel's argument and the jury instructions had unambiguously communicated to the jury that the prosecution had the burden of proving every element of the case beyond a reasonable doubt. (*Ibid*.) The court concluded in light of the entire record that there was no reasonable likelihood the jury erroneously construed the prosecution's burden of proof. (*Ibid*.)

Here as in the above cases, the prosecutor's argument was fair comment on the evidence. The evidence presented only two options. The first was a finding that Fletes and Villareal possessed the guns that were found where each defendant was last seen. The second was that the officers planted them. The prosecutor's argument that either defendants possessed the guns or the officers planted them was based on the only rational inferences that could be drawn from the evidence presented. That evidence showed that the guns had recently been put where they were later found. The one found near where

67

Fletes fell was "clearly" visible. "It wasn't out of sight." It was "just at the edge of" the Corvette's back bumper and "[i]t stood out because it was shiny." Yet Fletes, who had been painting car parts in the area since 5:30 or 6:00 o'clock that evening, claimed not to have seen that gun or the gun found in the coupe. Nor had he seen Villareal with a firearm that day. Since Fletes, Villareal, and the four gang task officers were the only people who were inside the shop at the relevant time period, the only rational inference from Fletes's testimony was that the officers planted the firearms. Here as in the above-cited cases, the prosecutor's argument was fairly grounded in the evidence.

Also as in the above-cited cases, nothing in the record suggests that the prosecutor's remarks caused the jury to believe the defense had any burden of proof. The prosecutor several times described his burden to "prove the guilt of the defendant[s] beyond all reasonable doubt." He did not suggest that the defense had any burden of proof.

Villareal complains, however, that the prosecutor misstated the burden of proof by describing the reasonable doubt standard as "low." When the prosecutor's use of the word "low" is viewed in context, it could not have misled the jury.

The trial court ruled in limine that the defense attorneys could not refer to the prosecution's burden as "beyond all doubt" or "beyond all possible doubt." In his closing argument, the prosecutor was explaining the difference between minor inconsistencies, reasonable doubt, and all doubt. He stated, "Now, minor inconsistencies. Now, you're going to look at every case, and there's always going to be inconsistencies. You can scrutinize every case, but it's human nature. That's why the burden is just beyond a reasonable doubt, not all doubt. Because it's human nature, you're going to have these minor inconsistencies. *That's why the burden is low.* That's why it's not beyond all doubt --" (Italics added.) Defense counsel immediately objected that "the burden is not low," and the trial court sustained the objection. The prosecutor then stated, "It's not beyond all doubt, but it's beyond a reasonable doubt. That's it . . . ." He subsequently

68

stated that "[o]ur burden has been met. We have proved this case beyond a reasonable doubt. We don't have to prove it beyond all doubt, but we definitely proved it beyond a reasonable doubt." On these facts, it is not reasonably likely that the jury believed that the prosecution's burden was "low."

Any possible confusion would have been dispelled by defendants' counsels' subsequent arguments and by the court's instructions. Villareal's trial counsel emphasized, "The fact is we don't have to prove anything." "But you know, this insinuation . . . that I have to prove that a planting occurred . . . . It's a distraction . . . . We don't have to show you anything like that." Fletes's trial counsel similarly explained that "we don't have to produce any evidence, provide you with anything." The court's instructions included instructions on the presumption of innocence, the People's burden of proof beyond a reasonable doubt, and the definition of reasonable doubt. The court additionally instructed the jury that "[t]he Prosecution has the burden of proving guilt beyond a reasonable doubt. The Defense has no burden or duty to prove anything, or present any evidence. There is no burden, no duty. However, either side is entitled to comment on the failure to call a logical witness, or the failure to produce evidence." On this record, there was no reasonable likelihood that the jury misunderstood the prosecution's burden of proof. (*Samayoa*, *supra*, 15 Cal.4th at p. 842.) The complained-of argument was not misconduct. (*Osband*, *supra*, 13 Cal.4th at p. 697; *Young*, *supra*, 34 Cal.4th at pp. 1195-1196; *Samayoa*, at p. 842.)

Villareal contends that the prosecutor's alleged burden shifting was "wrong under due process." We have concluded that the prosecutor's argument was not misconduct. There is no predicate on which to base a claim of constitutional error. (*People v. Gurule* (2002) 28 Cal.4th 557, 656.)

### 2. Fletes's Contentions

Fletes claims the prosecutor committed misconduct by asking if he contended that the officers planted the guns that were found in the shop. He asserts that the question

69

sought to elicit speculative and thus "manifestly" inadmissible testimony. He argues further that the prosecutor "capitalized on the speculative answer that he wrongfully elicited" by "forcing" him to admit that he had no evidence to support his assertion that the guns were planted. We reject the argument.

On cross-examination, Fletes acknowledged the evidence pertaining to the loaded guns found in the shop. He testified that he had not seen either gun that day, that he had not seen Villareal with a gun that day, that it was "possible" he would have seen the gun under the Corvette had it been there earlier, and that that gun did not come out of his hands. He acknowledged that the only people in the shop between the time he was shot and the time the SWAT team went in and saw those guns were himself and Villareal, Pinon, Hoskins, Salas, and Plummer. The prosecutor then asked, "Are you saying that those officers put those guns there?" The question did not call for speculation. It asked Fletes to clarify his position given the overwhelming evidence against him. There is nothing improper about such questions where the defendant has personal knowledge of the events at issue. (*People v. Chatman* (2006) 38 Cal.4th 344, 382 (*Chatman*).) "The permissible scope of cross-examination of a defendant is generally broad. 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions . . . .'" (*Ibid.*) "A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is and give, if he is able, a reason for the jury to accept his testimony as more reliable." (*Ibid.*)

Fletes maintains that the questions were improper because there was "no reason to believe [he] had percipient knowledge of whether police placed the guns there." He phrases the issue too narrowly. Fletes was in a position to know who had access to his shop that day. He was in a position to know which of his employees were working that day and which customers came to the shop. He was in a position to know whether the shop had been left unattended at any point that day. He thus had personal knowledge that

70

would allow him to provide testimony that could assist the jury in determining whether he and Villareal possessed the guns that were found in the shop that night. The prosecutor did not commit misconduct by asking Fletes to clarify his position and explain whether he had any information to support it.

Fletes's reliance on *People v. Zambrano* (2004) 124 Cal.App.4th 228 is misplaced. The prosecutor in that case "did not ask defendant one or two 'were they lying' questions to clarify his testimony." (*Id*. at p. 232.) She instead used the questions to "berate" the defendant, "repeatedly and painstakingly ask[ing] defendant whether the officers were 'lying' about every aspect of their testimony that differed from defendant's testimony." (*Id*. at pp. 232, 242.) Nothing like that occurred here. The prosecutor repeated the question several times, one time at Fletes's request and the other times because Fletes's answers were nonresponsive. It is not misconduct to repeat an unobjectionable question when the witness gives a nonresponsive answer.

Fletes argues that the prosecutor improperly "capitalized" on the misconduct and mischaracterized the evidence when he stated during closing argument, "Defendants, guns, and ammo. More circumstantial evidence. They're seen in the defendants' hands, the guns and the ammo, and gun cases that were found at 1367 Dayton, the guns and ammo that were found at 303 Navajo, in the kitchen, in the garage. And Fletes'[s] explanation for all of these items? His explanation to you, for all of these items? 'I don't know,' and, [']The police planted them.'" This was fair comment on the evidence. Fletes denied knowledge of the firearms and ammunition found in the shop and at his residence, and he stated his belief that the officers planted the two guns that were found at the shop.

Fletes next complains that the prosecutor "falsely" argued that Salas denied that police carry extra guns. The prosecutor stated, "Now, [Fletes's trial counsel] asked questions to, I think one of the officers, Well, do you know officers carry backup guns? Of course, the answer was no. Yet, why would he ask that? Because he want[s] to plant

71

these seeds." Fletes's trial counsel's objection that the question misstated the testimony was overruled.

In fact, Salas testified very generally that he knew of "other officers" who carry backup guns. The complained-of testimony proceeded as follows. "Q: And do you have a backup gun, as far as for your own safety, in case your gun jams? [¶] A: No, I do not. [¶] Q: Do you know if other officers have backup guns? [¶] A: Do I know of other officers that do? [¶] Q: Yes. [¶] A: Yes. [¶] Q: All right. Do you know whether Hoskins has one? [¶] A: No. [¶] Q: How about Pinon? [¶] A: No. [¶] Q: Now, do you—and I want to be a little bit more specific. Are you saying that you don't know one way or the other, or that you know for a fact that they don't? [¶] A: I do not know one way or the other." There was no evidence that Pinon, Hoskins, or Plummer carried backup guns. Plainly, that was the point the prosecutor was making. Moreover, the parties' stipulation about the two guns that were found in the shop provided no reasonable basis for inferring that either of the guns that were found was ever in the possession of Pinon, Hoskins, or Plummer. Those two guns were traced to other owners. The stipulation about how those owners would testify provided no link to the officers involved in this case.

Fletes next argues that the prosecutor "repeatedly attacked defense counsel," criticizing him for implying that the officers planted the guns. As already explained, it is not misconduct to describe the deficiencies in opposing counsel's tactics. (*Frye*, *supra*, 18 Cal.4th at p. 978.) The prosecutor's remarks here were fair comment on the defense case. (*Bemore*, *supra*, 22 Cal.4th at p. 846.)

Fletes next argues that the prosecutor disparaged Fletes's trial counsel in questioning Sandra Fletes about the paint sprayer. The evidence technicians did not initially collect the paint sprayer because "there was no indication it was involved." Sandra Fletes testified that Fletes's sister collected the paint sprayer the day after

72

defendants' arrest and delivered it to Fletes's trial counsel. A police detective picked it up on January 29, 2009, and delivered it to the crime lab that same day.

The prosecutor cross-examined Sandra Fletes about the paint sprayer as follows. "Q: Okay. [¶] Who collected that? [¶] A: My sister-in-law. [¶] Q: And when was that? [¶] A: That same day. [¶] Q: All right. And she then brought it to Miguel Hernandez? [¶] A: Yes. [¶] Q: Why did she bring it to Miguel Hernandez? [¶] A: We believed that it may be part of the case. [¶] Q: All right. But he is your husband's attorney; right? [¶] A: Yes. [¶] Q: And has been your husband's attorney; correct? [¶] A: Yes. [¶] Q: And he represented him back in 1988?" Fletes's trial counsel interposed a relevance objection at this point, which was overruled. They continued as follows. "Q: And so, that was the first person that [Isela] went to with this paint sprayer; correct? [¶] A: Who was it? [¶] . . . [¶] Q: Isela. And that was the first person she went to; correct? [¶] A: I'm not sure if that was the first person she went to, but it's assumed, yeah. [¶] Q: Okay. She didn't call the police; right? [¶] A: Not to my knowledge."

Fletes argues that the only plausible purpose of the prosecutor's questions was to imply that Fletes selected his attorney because he could rely on him to use dishonest tactics. He asserts that "[t]here was no other likely inference the jury would have drawn" from this evidence than that "Hernandez would have [been] inclined to tamper with the sprayer to advance Fletes'[s] defense." We disagree.

The questions were not improper. They sought relevant testimony establishing the chain of custody for the paint sprayer, which the defense contended was in Fletes's hand when he was shot. The most reasonable inference from Sandra Fletes's testimony is that his sister called his attorney about the paint sprayer because she knew he had represented Fletes before and either assumed or knew that he would represent him again. This was established by the prosecutor's subsequent cross-examination of Fletes's sister. "Q: [T]he first person you brought [the paint sprayer] to was Miguel Hernandez; correct? [¶] A: Yes. [¶] Q: And that's because he's your husband's attorney? [¶] A: My brother's

73

attorney. [¶] Q: Your brother's attorney. Thank you. . . . And he's been your brother's attorney for a long time? [¶] A: Yes." In any event, it is obvious that the jury did not draw a harmful inference from the challenged questioning. The testimony was relevant only to the section 245, subdivision (d) counts. The jury acquitted both defendants on those counts.

Fletes contends that the prosecutor committed misconduct during closing argument by misstating the evidence during his argument that Villareal aided and abetted Fletes in assaulting Pinon.

The prosecutor stated, "You have the principal, Fletes, committing the assault with a firearm. Villareal knew Fletes intended to commit that [assault with a] firearm. [¶] How do we prove that? He's running back, he's saying something to him. He's saying something to him based on the cops that he just saw outside, the marked patrol car that he just saw outside." "Like I talked about, the Sureño knowledge. And then, the third element, 'Villarreal intended to aid and abet Fletes before or during the crime.' That's what he was doing when he was speaking to him as he was running back. *He was telling him, Here come the cops, get ready*." (Italics added.) Fletes's counsel objected that there was "no evidence that he said anything of that." The objection was overruled, and the prosecutor continued, "Villarreal's words or conduct did aid and abet. By telling him he's coming, guess who got ready? Guess who crouched down behind that grill and was coming around? Defendant Fletes. By yelling at him, he aided -- his words did aid and abet Defendant Fletes."

Fletes argues that there was no evidence that Fletes yelled, "Here come the cops, get ready." The Attorney General acknowledges the absence of direct evidence that Villareal made that statement. She argues, however, that the incorrect statement was not prejudicial. We agree. There is no reasonable likelihood that the jury construed or applied the prosecutor's statement in an objectionable fashion. The statement was made

74

in the context of an argument that Villareal aided and abetted Fletes in assaulting Pinon. The jury acquitted both defendants on the assault counts.

Fletes next argues that the prosecutor committed misconduct by eliciting evidence in violation of two in limine rulings. The first ruling excluded any mention of the indecent exposure aspect of Villareal's prior misdemeanor conviction for engaging in lewd or dissolute behavior in public. We have already addressed Villareal's complaint about the prosecutor's improper questioning of Sandra Fletes. (*Ante*, pp. 52-55.) We concluded that the trial court did not abuse its discretion in denying defendants' mistrial motions. Nothing in Fletes's argument changes our conclusion.

The second in limine ruling permitted the prosecution to elicit testimony that Fletes was contacted by police in a known Sureño gang area on September 2, 1997, but prohibited mention that he was seen engaging in hand-to-hand narcotics transactions. Fletes complains that the prosecutor violated this ruling during his examination of Zuniga. The complained-of questioning proceeded as follows. "Q: Fair enough. September 1997. Another law enforcement gang contact with Carlos Fletes? [¶] A: That's correct. [¶] Q: Describe that, please. [¶] A: Basically, officers had obtained information about a known Sureño hang out area that had been selling -- or Sureño gang members were selling drugs. They ultimately set up a surveillance and identified Mr. Fletes making multiple hand-to-hand transactions, selling what they believed to be drugs." Fletes's counsel objected and moved for a mistrial. At a sidebar conference, the trial court denied the mistrial motion. The court then told the jury, "Objection's sustained. The answer is stricken."

Fletes contends that the prosecutor engaged in prejudicial misconduct by "manifestly" failing to warn Zuniga not to testify about the hand-to-hand transaction aspect of the September 2, 1997 contact with police. We cannot agree.

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew*

75

(2003) 31 Cal.4th 822, 839.) "A prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. [Citations.] If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement. [Citation.]" (*People v. Warren* (1988) 45 Cal.3d 471, 481-482 (*Warren*).)

Here, it was Zuniga's answer rather than the prosecutor's question that went too far. We agree with Fletes that the prosecutor had a duty to warn Zuniga not to mention the hand-to-hand aspect of the prior police contact. (*Warren*, *supra*, 45 Cal.3d at p. 482.) But we cannot agree with his contention that the prosecutor "manifestly" failed to do so. The record reflects the prosecutor's admission outside the presence of the jury that Zuniga "went too far on the hand-to-hand." His ready admission suggests to us that he had in fact advised Zuniga of the trial court's in limine ruling but that Zuniga inadvertently blurted out more information than the ruling permitted. On this record, we cannot say that the prosecutor elicited or attempted to elicit inadmissible evidence in violation of the trial court's ruling.

Even if we assume misconduct, Fletes has not shown prejudice. Zuniga's reference to hand-to-hand transactions was fleeting. The contact he described was less serious than Fletes's other prior police contacts, several of which involved shootings. The hand-to-hand exchange occurred in 1997, when Fletes was admittedly an active gang member, hanging out with the wrong crowd and committing crimes that ultimately sent him to prison. The trial court admonished the jury that the answer was stricken. It is not reasonably probable that Fletes would have obtained a more favorable result had Zuniga not mentioned the 1997 hand-to-hand transactions. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133 (*Barnett*).)

Fletes next argues that the prosecutor committed misconduct in arguing that defendants had the propensity as gang members to possess and to use guns.

76

The prosecutor began his closing argument as follows. "[W]hen I first gave my opening statement, I . . . basically told you what this case is about. And now we have seen, based on the evidence, based on the proven facts, based on all of the facts, it's clear that this is a case about gangs and guns. That's what it comes down to. Okay? [¶] It comes down to the two defendants, who are Sureño gang members; who are convicted felons, possessing guns; *having a propensity, based on being a gang member*, to use those guns; and basically pointing those guns at a police officer. That's what this case is about." (Italics added.) In summing up his argument, the prosecutor stated, "After the presentation of all and only the evidence in this trial, it's clear that the defendants are felons. They are Sureño gang members. They possessed the guns. *They had the propensity, as gang members* to not only possess those guns but use those guns, and they did use those guns when Defendant Fletes pointed the gun at Officer Pinon. You apply those facts to the laws that we just went through and you reach your verdict, and the verdicts are guilty." (Italics added.)

Fletes contends that the prosecutor's statements amounted to an argument that the jury should convict him based on his apparent bad character. His failure to object on this basis below has forfeited the issue on appeal. (Evid. Code, § 353; *Dykes*, *supra*, 46 Cal.4th at p. 763.)

Even if we assume that he preserved the argument and even if we assume misconduct, Fletes has not shown prejudice. We presume that the jury understood and followed the trial court's instructions, which included an instruction that gang-related evidence could not be used to conclude that either defendant was a person of bad character or that he had a disposition to commit crime. (*Edwards*, *supra*, 57 Cal.4th at p. 723.) The jury acquitted defendants on the section 245, subdivision (b) counts, and the evidence supporting conviction on the firearm possession counts was overwhelming. The only reasonable inference that could be drawn from defendants' actions outside the shop and as they ran from the officers was that they were armed. Two loaded guns were

77

subsequently found, one in the area where Fletes was shot and the other in the area where Villareal was seen. There was no evidence that a shop employee, a customer, or a stranger put those guns where they were found. There was no evidence that the police planted those guns. It is not reasonably probable that defendants would have obtained a more favorable result had the prosecutor not mentioned "propensity" in his closing argument. (*Barnett*, *supra*, 17 Cal.4th at p. 1133.)

## F. Cumulative Error

Defendants argue that while each of their asserted error was "of federal constitutional dimension and each of these errors requires reversal of [their] convictions, taken together they resulted in a fundamentally unfair trial, and . . . due process requires a new trial." We disagree. Defendants were entitled to a fair trial, not a perfect one. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no trial court error that resulted in prejudice to either defendant. Thus, there is no prejudice to cumulate.

## G. Pitchess Motions

Defendants ask that we review the sealed transcripts of the trial court's in camera hearings on their supplemental *Pitchess* motions for discovery of additional materials in Pinon's and Hoskins's personnel files.

A criminal defendant has a limited right to discovery of peace officer personnel records. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538; Evid. Code, §§ 1043-1047; §§ 832.5, 832.7-832.8.) "The procedure requires a showing of good cause for the discovery, an in camera review of the records if good cause is shown, and disclosure of information 'relevant to the subject matter involved in the pending litigation.' [Citation.]" (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316.) "A motion for discovery of peace officer personnel records is addressed to the sound discretion of the trial court, reviewable for abuse." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

The trial court granted defendants' original *Pitchess* motions and after an in camera hearing on July 10, 2009, ordered the disclosure to the defense of contact information for certain individuals who had filed complaints about the officers. In March 2011, defendants filed supplemental or follow-up motions seeking any relevant information from July 2009 forward. The District Attorney did not oppose the supplemental motions. The trial court conducted an in camera hearing and determined that there were no additional discoverable materials in the officers' files. The court denied the motions on April 22, 2011.

We have reviewed the transcripts of the hearings on defendants' original and supplemental *Pitchess* motions and find those transcripts fully adequate to afford meaningful review. The trial court did not abuse its discretion in denying defendants' supplemental *Pitchess* motions.

### III. Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.




_____
Elia, J.








*People v. Villareal, et al.*
H038081